## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANA CARTER,                                         :         CIVIL ACTION
                                                     :
                    Plaintiff,                       :         NO.  06-3000
                                                     :
          v.                                         :
                                                     :
RONALD MORRISON,                                     :
MANNY ARROYO,                                        :
BERNON LANE,                                         :
PAMELA BROWN,                                        :
PATRICIA JOHNSON,                                    :
LENORA KING,                                         :
LAUREN TROPPAUER,                                    :
JUNIUS RUSSELL,                                      :
COMMUNITY EDUCATION CENTERS,                         :
MONIQUE ROGERS,                                      :
JOSE ALVARADO,                                       :
ELDA CASILLAS,                                       :
FREDDIE HARRIS,                                      :
THOMAS COSTA,                                        :
PAUL O'CONNOR,                                       :
LAWRENCE MURRAY,                                     :
DALE EVANS,                                          :
LAUREN TAYLOR,                                       :
MARK CAREY,                                          :
WILLIE JONES,                                        :
JULIE STOWITZKY,                                     :
THOMAS PEKAR,                                        :
JEFFREY BEARD,                                       :
EVANS GARY,                                          :
                                                     :
                    Defendants.                      :

## MEMORANDUM

BUCKWALTER, S.J.                                     November 28, 2007

          Presently before the Court are Defendants O'Connor, Alvarado, and Casillas's

1

Motion to Dismiss, in part, pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 41), Plaintiff's

Answer thereto (Docket No. 46), and Defendants O'Connor, Alvarado, and Casillas's Reply to

Plaintiff's Answer (Docket No. 47); Defendants King, Troppauer, Russell, Morrison, Arroyo,

Lane, and Johnson's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and Motion to Strike

the Amended Complaint pursuant to Fed. R. Civ. P. 12(f) (Docket No. 55), and  Plaintiff's

Declaration in Opposition (Docket No. 70); Defendants Costa, Murray, Stowitzky, Beard, and

Gary's Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(6) (Docket No. 56) and Plaintiff's

Declaration in Opposition (Docket No. 69); Defendant Taylor's Motion to Dismiss pursuant to

Fed R. Civ. P. 12(b)(6) (Docket No. 57) and Plaintiff's Declaration in Opposition (Docket No.

67); Defendant Carey's Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(6) (Docket No. 61)

and Plaintiff's Declaration in Opposition (Docket No. 68); and Defendants Community Education

Centers and Monique Rogers's Motion for Joinder of Defendants King, Troppauer, Russell,

Morrison, Arroyo, Lane, and Johnson's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

and Motion to Strike the Amended Complaint pursuant to Fed. R. Civ. P. 12(f).  For the reasons

stated below, Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part, and

the Motion to Strike the Amended Complaint is **DENIED**.

## I. BACKGROUND

Plaintiff, Dana Carter, proceeding pro se, makes a number of claims against

twenty-three defendants.  These claims arise out of Plaintiff's confinement in the Joseph E.

Coleman Center (the "Coleman Center"), a halfway house (known as a community corrections

center) where Plaintiff was serving a portion of his criminal sentence imposed in Pennsylvania

state court.

## A. THE ALLEGATIONS

Because these motions are filed under Rule of Civil Procedure 12(b)(6), the Court must accept as true all of Plaintiff's allegations.[1]

On March 1, 2004, Plaintiff was paroled to the Coleman Center (the "Center") from the State Correctional Institute at Greene (SCI-Greene), a state penitentiary. (Compl. ¶ 9.) Upon his arrival, he was given the Resident Handbook, which listed the Center's policies, procedures, and services. (Id. ¶ 9.) Plaintiff immediately began to question why certain services were not being offered as promised in the Handbook. Plaintiff also assisted other residents in filing grievances about policy violations and unprovided services. Writing to local politicians on his own behalf and on the behalf of others, Plaintiff advocated for change at the Center. (Pl.'s Aff. 1.)

On July 1, 2004, Defendants Arroyo, King, and Brown, all employees at the Center, called Plaintiff into King's office. They told Plaintiff that he was becoming a problem, and they suggested that he stop the "complaining and adjust like the rest." Plaintiff did not stop raising his concerns, however. (Compl. ¶ 17.)

On the morning of July 11, 2004, Plaintiff heard a gunshot as he was leaving the Center on a social pass. He telephoned the police from a pay phone and then left for the day. When he returned, he learned that a resident had been killed. Upon seeing Defendant Alvarado,

---

[1] The Coleman Defendants have argued that the amended complaint should be stricken under Federal Rule of Civil Procedure 12(f) because it is a supplement to the original complaint, and procedure requires one cohesive complaint. (Mem. Supp. Defs.' Morrison, Arroyo, Lane, Johnson, King, Troppauer and Russell's Mot. Strike Pursuant to F.R.C.P. 12(f), or Mot. Dismiss Pursuant F.R.C.P. 12(b)(6), at 7-8.) Because Plaintiff proceeds pro se, and courts have an obligation to read a pro se litigant's pleadings liberally, this motion is denied, and the Court will read Plaintiff's amended complaint as he intended, as a supplement to the original complaint.

his parole agent, Plaintiff told Alvarado that he had reported the shooting to the police, and because the shooting frightened him, Plaintiff requested a transfer. Alvarado replied that Plaintiff should have minded his own business and that he would not be transferred. Plaintiff then sent an official transfer application to Arroyo, who was the Director of the Center. Plaintiff never received a response. (Id. ¶¶ 19-25.)

During his stay at the Center, Plaintiff volunteered in the kitchen. There was no bathroom in the kitchen, and kitchen workers who needed to use the bathroom were directed to go outside, behind a dumpster. On July 21, 2004, Plaintiff was bitten by a spider while relieving himself. The spider bite resulted in abscesses that required medical treatment, including minor surgery. (Id. ¶¶ 26-30.) This risk was well known, yet Defendants Arroyo, Morrison, and Lane, all Center employees, as well as the Community Education Center (CEC), repeatedly refused to install a restroom. (Pl.'s Aff. 2.) After this incident, Plaintiff filed a grievance about the lack of a restroom, which went unanswered. (Compl. ¶¶ 28-29.) Plaintiff was bitten by another spider on October 21, 2005, this time in his sleeping quarters. He filed another grievance that again went unanswered. That bite also resulted in abscesses and medical treatment. (Pl.'s Aff. 5-6.)

On September 1, 2004, Defendants Alvarado and Casillas arrested Plaintiff for technical parole violations. (Compl. ¶¶ 31-33.) Plaintiff was held in a cold, smelly cell without access to a telephone, before being moved more than a day later to the State Correctional Institute at Graterford (SCI-Graterford) while he awaited a parole hearing. (Pl.'s Aff 3.) On September 8, 2004 Alvarado visited Plaintiff and advised him to plead guilty in order to avoid a twelve month "parole hit." Plaintiff refused. (Compl. ¶¶ 38.) He remained at SCI-Graterford until January 19, 2005, when he was transferred to SCI-Greene—still awaiting his parole hearing. Upon arriving

4

at SCI-Greene, Plaintiff was told he would be reparoled to the Coleman Center, again under the supervision of Alvarado. No hearing was ever given, and Plaintiff was not found guilty of any parole violations. (Compl. ¶¶ 42-45.) Plaintiff later determined that the technical violations that had been asserted were not violations at all, that in fact the complaint had been entirely fabricated to retaliate against him for raising concerns at the Center. (Pl.'s Aff. 4.)

Upon his return to the Center, King told Plaintiff that he would have to start over at phase one at the Coleman Center, meaning the progress he made and privileges he attained prior to the parole violation arrest were lost. Plaintiff protested this decision since he had not been convicted of any parole violations. King told Plaintiff that the decision had been made by Arroyo. Yet other residents in similar situations were permitted to stay in their previous phase. On February 10, 2005, Plaintiff requested that King ask Arroyo why he had to start over from phase one. King asked Arroyo, but no reason was ever provided. Plaintiff again formally requested from Arroyo that he be transferred. His request again went unanswered. (Id.)

The stress from these events mounted and culminated in April 2005 when Plaintiff checked himself into the psychiatric ward at Episcopal Hospital where he stayed for one week. The hospital treated Plaintiff for depression and prescribed drugs that Plaintiff continues to take on a regular basis. (Compl. ¶¶ 53-56.)

During this time, and at other times throughout his residence at the Coleman Center, Plaintiff submitted home plans. Based on the Court's best understanding of Plaintiff's allegations, a home plan consists of a request by a resident to be allowed to live outside the Center while on parole. The Center employees and/or the parole agents then investigate the plan to ensure that the resident will be moving into a stable home. Plaintiff submitted many home

5

plans that were never investigated by anyone. (Id. ¶ 57.)

In May 2005, Plaintiff completed a course in waste removal.  Thereafter, he began working at the Philadelphia Naval Base, where he was paid $12.00 an hour.  After just his third paycheck, Alvarado forced Plaintiff to quit his job, stating inaccurately that Plaintiff was required to quit because the Naval Base was unaware of his parole status.  As a result, Plaintiff returned to his previous position in a furniture factory, earning $5.50 an hour. (Pl.'s Aff. 4-5.)  At all times during his residence, the Center withdrew twenty percent of Plaintiff's earnings from each paycheck.  There was nothing in the Handbook that mandated these deductions.  Plaintiff asserts that Center employees were keeping these funds for themselves. (Compl. ¶¶ 11-14.)

On July 14, 2005, Plaintiff was again arrested for technical violations, this time on the false charge that a phone was found by Defendant King in Plaintiff's bed.  The Center confined Plaintiff in the PennCapp unit, a part of the Coleman Center where violators are confined and receive counseling.  On July 20, 2005, Alvarado visited Plaintiff.  He urged Plaintiff to plead guilty and thus avoid another stay at SCI-Graterford where he might remain until the expiration of his maximum sentence.  Under Alvarado's pressure, Plaintiff pleaded guilty.  As a result, Plaintiff spent ninety days in the PennCapp program. (Compl. ¶¶ 62-65.)  While he was at PennCapp, Arroyo and Morrison did not allow Plaintiff to leave for doctors' appointments even though they permitted others in PennCapp to keep their appointments. (Id. ¶¶ 68-69.)

In August, 2005, Arroyo resigned as Director of the Coleman Center.  Defendant Lane replaced him. (Pl.'s Aff. 5.)

Alvarado visited Plaintiff in PennCapp on September 19, 2005.  Plaintiff pleaded

with Alvarado to be transferred once he finished his ninety days there.  Alvarado agreed.
However, when Plaintiff was released, he once again had to report to the Coleman Center—with
Alvarado as his parole agent and phase one as his starting point.  Defendant Troppauer was his
new counselor.  In response to his complaints about starting over again, Lane and Alvarado
merely told him that he was lucky not to be back in prison. (Id.; compl. ¶¶ 71-74.)

The problems persisted after Plaintiff's return.  On December 13, 2005, Plaintiff
was punished for unsubstantiated complaints made to the Center by Plaintiff's acquaintance from
outside the Center.  As a result, Plaintiff was confined at the Center during the holiday season.
(Pl.'s Aff. 6.)

Also in December, a supervisor was fired in response to complaints by Plaintiff
and other residents, which created rising tension between the staff and residents at the Center.
Those who had complained about the fired supervisor were systematically forced to leave the
Center—sent back to prison or to PennCapp. (Id.)  On January 9, 2006, Defendant Russell—who
had only been hired as an Operations Counselor as of December 19, 2005—searched Plaintiff as
he arrived back to the Center from classes.  Russell's search was "unprofessional and rude." (Id.).
Plaintiff filed another grievance.  When Russell found out about the grievance, he filed a "special
report" falsely claiming that Plaintiff and two other residents had threatened him while
conducting the search.  Morrison assisted in filing the special report.  On January 11, Plaintiff,
along with several others, was arrested for making the threats. (Id. at 7.)  Alvarado and Casillas
were also involved in this plan to arrest those who had complained.  Of those arrested, at least
three were African American.  Unlike residents of other races, they were not given the
opportunity to have a case conference or explain themselves.  After the arrest, Plaintiff was taken

7

back to SCI-Graterford. (Id.)

Alvarado visited Plaintiff, and he again suggested that Plaintiff plead guilty, this time with the promise to spend forty-five days at SCI-Graterford and return "back on track." Plaintiff refused. (Id.) On January 24, 2006 there was an initial parole hearing.  Russell gave testimony, and the charges were not dismissed.  After the hearing, Defendant Harris, another Center employee, told Plaintiff that "they have wanted to get you for a long time."  Harris would not say who "they" were.  Plaintiff learned from his follow residents that Morrison had a list of residents he wanted removed from the Center.  Those who had complained about the fired supervisor were each on this list. (Id.)  On January 26, 2006, Plaintiff sent a letter to the Center asking for an update on his grievance of January 9, 2006 and for his belongings and money the Center allegedly still owed him.  No response ever came. (Id. at 8.)

On April 25, 2006, Plaintiff had his parole revocation hearing.  Plaintiff still awaits the final determination from this hearing. (Id.)

Plaintiff commenced this action on July 10, 2006.

## B. THE CLAIMS

After a review of Plaintiff's pleadings and Defendants' responses, the Court has determined that Plaintiff is making the following claims:

1.   A series of damages claims and requests for declaratory relief under 42 U.S.C. § 1983 for violations of Plaintiff's First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights;

2.   A damages claim under 42 U.S.C. § 1985(3) for conspiracy;

3.   A claim under the Privileges and Immunities Clause of Article IV of the

8

U.S. Constitution;

4.      A request that the Court declare unconstitutional 37 Pa. Cons. Stat. §§
        71.1(a) and 94.3;

5.      A damages claim under the Racketeer Influenced and Corrupt
        Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq;[2]

6.      A series of damages claims under state law, including breach of duty,
        abuse of authority, abuse of process, malicious prosecution, false arrest,
        false imprisonment, intentional infliction of mental and emotional distress,
        defamation, breach of contract, and conversion.[3]

7.      A request for injunctive relief requiring Defendants to return Plaintiff's
        lost wages and property; to end Defendants Alvarado's and Casillas's
        oversight of Plaintiff; and to prevent the defendants from committing
        "further misconduct, retaliation, racial discrimination, or official abuse."
        (Am. Compl. 8.)

## C. THE DEFENDANTS AND THE GROUNDS FOR DISMISSAL

        Nineteen Defendants have submitted motions to dismiss under Federal Rule of
Civil Procedure Rule 12(b)(6).  In some cases, the arguments overlap, and in others, groups of
defendants make differing arguments. This section delineates the groups of defendants and their

---

    [2] Plaintiff now concedes that his claims under the Privileges and Immunity Clause of
Article IV, under RICO, and his request that the Court declare 37 Pa. Cons. Stat. §§ 71.1(a) and
94.3 unconstitutional all lack merit. (See Pl.'s Answer to Original Commonwealth Defs.' Mot.
Dismiss Pl.'s Am. Compl. 3, 10.)  Therefore, these claims are dismissed as to all the defendants.

    [3] The Court has interpreted Plaintiff's claims of "destruction of property" and
"unauthorized appropriation of funds" as a conversion claim.

9

asserted grounds for dismissal.

The first group, referred to as the "Commonwealth Defendants," includes Paul O'Connor, the Director of the Bureau of Community Corrections within the Department of Corrections (DOC); Jose Alvarado, a Parole Agent for the Pennsylvania Board of Probation and Parole (the "Parole Board"); and Elda Casillas, a Parole Supervisor for the Parole Board.

The Commonwealth Defendants assert (1) that Plaintiff fails to state a claim upon which relief may be granted under the Fifth, Eighth, and Fourteenth Amendments, the Privileges and Immunities Clause, and RICO; (2) that Plaintiff's conspiracy claim under section 1985(3) fails because the complaint and amended complaint lack the required specificity; and (3) that sovereign immunity bars Plaintiff's state law claims.  In addition, the Commonwealth Defendants assert that there are no cognizable claims whatsoever against O'Connor.[4] (See Commonwealth Defs.' Mot Dismiss, in Part, Pl.'s Compl.)

The second group, referred to as the "Additional Commonwealth Defendants," includes Jeffrey A. Beard and Evans Gary, Officials in the DOC; and Lawrence Murray, Julie Stowitzky, and Thomas Costa, Parole Board employees.  These defendants were added in Plaintiff's Amended Complaint. (Am. Compl. ¶¶ 5-6.)

The motion to dismiss on behalf of the Additional Commonwealth Defendants is largely the same, with the following additional arguments set forth: (1) that Plaintiff fails to state a claim for which relief may be granted under the First and Fourth Amendments; and (2) that Plaintiff's section 1983 claims fail against the Additional Commonwealth Defendants because

---

[4] Plaintiff now concedes that his claims against O'Connor lack merit. (See Pl.'s Answer to Original Commonwealth Defs.' Mot. Dismiss Pl.'s Am. Compl. 12.)  Therefore, all the claims against O'Connor are dismissed.

they do not state any personal involvement by the Additional Commonwealth Defendants in the alleged constitutional wrongdoing. (See Additional Commonwealth Defs.' Mot Dismiss Pl.'s Am. Compl.)

Defendants Lauren Taylor and Mark Carey each submitted their own motions to dismiss. In each case, they set forth the same general arguments, but these parties argue additionally that because there are no allegations of personal involvement, the section 1983 claims must fail. (See Def. Taylor's Mot Dismiss Pl.'s Am. Compl.; Def. Carey's Mot Dismiss Pl.'s Am. Compl.)

The third group, referred to as the "Coleman Defendants," consists of Ronald Morrison, Manny Arroyo, Bernon Lane, Nicole Johnson, Lenora King, Lauren Troppauer, and Junius Russell, all of whom were employed at the Coleman Center during at least some portion of the period of Plaintiff's allegations.

This group has generally asserted the same grounds for dismissal as those above, with the following additions: (1) that Plaintiff failed to pursue and exhaust administrative remedies; (2) to the extent that there are claims stemming from activity prior to July 10, 2004, that Plaintiff failed to timely commence this action under the statute of limitations; and (3) that Plaintiff's intentional infliction of emotional distress claim fails as a matter of law. (See Defs. Morrison, Arroyo, Lane, Johnson, King, Troppauer, and Russell Mot. Strike and Mot Dismiss.) The Coleman Defendants have not, however, claimed that Plaintiff's state law claims are barred by sovereign immunity.

This group also now includes Monique Rogers and the Community Education Centers (CEC), who have joined the Coleman Defendants' motion to dismiss. In addition, the

11

CEC argues that, as a municipal organization, it cannot be held liable under section 1983 because Plaintiff does not allege that a decision maker with final authority either instituted or approved others' decision to institute unconstitutional policies. (See Joinder Mot. Defs. Rogers and Community Educations Center to Defs. Morrison, Arroyo, Lane, Johnson, King, Troppauer, and Russell Mot. Strike and Mot Dismiss.)

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The motion "may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000). The defendant bears the burden of persuading the Court that no claim has been stated. Gould Elecs., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

The Court notes that it has an obligation to read a pro se litigant's pleadings liberally. Holley v. Dept. of Veterans Affairs, 165 F.3d 244, 247-48 (3d Cir. 1999) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). Courts must apply the applicable law, regardless of whether the pro se litigant cited the applicable law or referenced it by name. Holley, 165 F.3d at 248. A complaint filed by a pro se party should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Hughes v. Rowe, 449 U.S. 5, 10 (1980).

## III. DISCUSSION

### A. STATUTE OF LIMITATIONS

12

The Coleman Defendants argue that all of Plaintiff's claims arising out of conduct prior to July 10, 2004 should be dismissed for failure to timely commence this action under the statute of limitations.  This part of the Coleman Defendants' Motion to Dismiss is denied because, even assuming that the Coleman Defendants' analysis of the statute of limitations is correct, the Court concludes that none of Plaintiff's claims rely on conduct prior to July 10, 2004. The only references to events prior to this date are merely background in nature and as such do not form the basis of any of Plaintiff's claims. (See Pl.'s Aff. 1-2.)

## B.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

Under the Prison Litigation Reform Act (PLRA), a prisoner who is "confined in any jail, prison, or other correctional facility" may not bring a claim "with respect to prison conditions under section 1983 of this title, or any other Federal law, until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  Failure to exhaust administrative remedies is an affirmative defense that the defendants must plead and prove. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir.2002).  Furthermore, "[t]he PRLA does not require exhaustion of all remedies. Rather, it requires exhaustion of such administrative remedies 'as are available.'" Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002) (quoting 42 U.S.C. § 1997e(a)).

The issue here is whether Plaintiff exhausted his "available" administrative remedies by filing grievances to which he received no response.  The Coleman Defendants assert that exhaustion "means completing all available appeals, even if prison officials do not respond." (Mem. Law Supp. Defs. Morrison, Arroyo, Lane, Johnson, King, Troppauer, and Russell Mot.

13

Strike and Mot Dismiss 9.) The cases they cite, however, do not support this proposition.[5] The Third Circuit has not answered this question squarely. In <u>Croak</u>, the Third Circuit held that a plaintiff had exhausted his remedies where officers misleadingly told him he was not required to file a grievance. In such a circumstance, the court concluded, the plaintiff exhausted his remedies because, in essence, the grievance procedure had not been "available." <u>Croak</u>, 312 F.3d at 112-13; <u>see also</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003) (concluding that a prisoner lacked an "available" administrative remedy where prison officials refused to provide him with the necessary forms). A number of other circuits have concluded that a plaintiff who files grievances and receives no response has exhausted his or her remedies. See <u>Carroll v. Gricewich</u>, No. 1:07-cv-00070, 2007 WL 1521473, at *2 (E.D. Cal. May 22, 2007) (noting that the Fifth, Sixth, Seventh, Eighth, and Tenth Circuits have all concluded that administrative remedies are exhausted when grievances receive no reply). This Court concurs with this view.

Turning to the facts here, Plaintiff has alleged that he repeatedly filed grievances that went unanswered. He repeatedly filed requests that he be transferred; they too went unanswered. Therefore, noting that we are at the motion to dismiss stage and we must accept Plaintiff's allegations as true, the Court will not dismiss any of his claims for failure to exhaust.

## C. STATE TORT CLAIMS

### 1. SOVEREIGN IMMUNITY

---

[5] The Coleman Defendants cite two cases. In <u>Davis v. Warman</u>, the Third Circuit held that simply because language setting forth rules for filing grievances was permissive, the plaintiff was not excused from meeting the PLRA's exhaustion requirements. 49 Fed. Appx. 365, 367 (3d Cir. 2002). In <u>Brown v. Morgan</u>, a Sixth Circuit case that is not at all relevant here, the Court held that the statute of limitations tolled while the plaintiff exhausted his available administrative remedies. 209 F.3d 595, 596 (6th Cir. 2000). Neither case considered whether a plaintiff had exhausted his remedies when after filing an initial grievance he received no response.

All of the defendants except the Coleman Defendants seek to dismiss Plaintiff's state law claims based on sovereign immunity. Under the doctrine of sovereign immunity, plaintiffs are barred from bringing state tort claims against employees of Commonwealth agencies who are acting within the scope of their duties unless the case falls under one of several enumerated exceptions.[6] 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. § 8522; McGrath v. Johnson, 67 F. Supp. 2d 499, 511 (E.D. Pa. 1999).

Plaintiff concedes that the Commonwealth Defendants, the Additional Commonwealth Defendants, Mark Carey, and Lauren Taylor are all employees of either the Department of Corrections or the Parole Board. (See Amended Compl. ¶¶ 5, 6a.) They are thus entitled to the protection afforded by sovereign immunity. See Maute v. Frank, 657 A.2d 985, 986 (Pa. Super. Ct. 1995) (applying sovereign immunity defense on behalf of state prison officials); Wilson v. Marrow, 917 A.2d 357 (Pa. Commw. Ct. 2007) (applying sovereign immunity defense on behalf of parole board officials). Additionally, as set forth in the complaint, the acts for which the defendants are being sued were clearly conducted within the scope of their duties as employees of the Department of Corrections or Parole Board. Plaintiff does not dispute this conclusion.

Plaintiff does, however, make two arguments for why the sovereign immunity

---

[6] The exceptions are as follows: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous road conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. Cons. Stat. § 8522. It might be argued that the third of these exceptions applies because Plaintiff alleges that the Coleman Center and its employees failed to return his property and took a portion of his earnings. However, these allegations implicate only the Coleman Defendants, who have not raised the sovereign immunity defense.

defense does not apply here.  First, he argues that sovereign immunity does not preclude his state law claims to the extent that they seek damages from defendants in their individual capacities. (Pl.'s Answer to Original Commonwealth Defs.' Mot. Dismiss Pl.'s Am. Compl. 10-12.)  This argument is unavailing because, contrary to his contentions, sovereign immunity does "bar[] monetary relief claims against state defendants acting in their individual capacity." Story v. Mechling, 412 F. Supp. 2d 509, 519 (W.D. Pa. 2006) (citing Maute, 657 A.2d at 986).  Second, Plaintiff argues that the defense does not apply because his allegations "constitute a crime, actual fraud, actual malice or willfull misconduct." (Pl.'s Answer to Original Commonwealth Defs. 10-12.)  This argument also fails.  Commonwealth employees are immune from liability even for intentional torts. La Frankie v. Miklich, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).  It is only local agency employees who lose their immunity defense when their actions constitute a crime, actual fraud, actual malice, or willful misconduct. See Cassidy v. Abington Twp., 571 A.2d 543 (Pa. Commw. Ct. 1990).  Here, all the employees asserting the defense of sovereign immunity are Commonwealth employees, not local agency employees, and thus this exception does not apply.

Therefore, because all of the alleged conduct took place within the scope of the defendants' employment and because none of the enumerated exceptions applies to this case, Plaintiff's state law claims must be dismissed as to the Commonwealth Defendants, the Additional Commonwealth Defendants, Defendant Carey, and Defendant Taylor.

## 2. PLAINTIFF'S STATE LAW CLAIMS AGAINST THE COLEMAN DEFENDANTS

While the Coleman Defendants do not raise a sovereign immunity defense, they

16

still argue that all of the state law claims should be dismissed.  They argue that the "only state law claim that can be attributable to [the] Coleman Defendants is the claim for Intentional Infliction of Emotional Distress." (Mem. Law Supp. Defs. Morrison, Arroyo, Lane, Johnson, King, Troppauer, and Russell Mot. Strike and Mot Dismiss 22 n.1.)  And as to the intentional infliction of emotional distress claim, they argue that the Pennsylvania Supreme Court has not recognized this cause of action, or, in the alternative, that Plaintiff has failed to establish the elements of the claim. (Id.)

While it is true that the Pennsylvania Supreme Court has not definitively determined the viability of an intentional infliction of emotional distress claim, the Third Circuit has generally concluded that Pennsylvania law does recognize the tort. See, e.g., Brown v. Muhlenberg Twp., 269 F.3d 205, 218-19; Cox v. Keystone Carbon Co., 861 F.2d 390, 394-95 (3d Cir. 1988).  The elements of this claim are "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." Chuy v. Philadelphia Eagles Football Club, 595 f.2d 1265, 1273 (3d Cir. 1979) (citing Restatement (Second) of Torts § 46).

The Coleman Defendants argue that Plaintiff's allegations fail to establish the first and last of these elements.  Plaintiff has alleged that he spent one week in a psychiatric ward of a hospital as a result of—at least in part—the Coleman Defendants' conduct.  Such allegations, if proved true, could meet the element of severe emotional distress. As to the element of outrageous conduct, under Pennsylvania law, a plaintiff must allege conduct that is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Hoy v. Angelone, 720 A.2d

17

745, 754 (Pa. 1998) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). "As a preliminary matter, it is for the court to determine if the defendant's conduct is so extreme as to permit recovery." Cox, 861 f.2d at 395. Third Circuit courts have, for example, refused to dismiss intentional infliction of emotional distress claims brought by prisoners based on allegations that prison officials failed to protect inmates from sexual assaults, see, e.g., White v. Ottinger, 442 F. Supp. 2d 236, 251 (E.D. Pa. 2006); Belt v. Geo Group, Inc., No. 06-1210, 2006 WL 1648971, at *3 (E.D. Pa. June 12, 2006), and failed to take seriously a prisoner's medical problems. See Rodriguez v. Smith, No. 03-3675, 2005 WL 1484591, at *9 (E.D. Pa. June 21, 2005). Additionally, "Pennsylvania courts have . . . indicated that they will be more receptive [to intentional infliction of emotional distress claims] where there is a continuing course of conduct." Williams v. Guzzardi, 875 F.2d 46, 52 (3d Cir. 1989). This Court concludes that at this stage of the litigation, where Plaintiff claims that he was continuously prevented from completing the Center program and systematically retaliated against for exercising his rights, the Court cannot dismiss Plaintiff's intentional infliction of emotional distress claim.

The Coleman Defendants' assertion that Plaintiff's other state law claims should be dismissed because they are not attributable to them is without merit. To the extent that Plaintiff states cognizable claims for breach of duty, abuse of authority, abuse of process, false arrest and imprisonment, and conversion,[7] the facts clearly implicate at least some of the

---

[7] The Coleman Defendants, it should be noted, do not argue that any of Plaintiffs state law claims, other than the intentional infliction of emotional distress claim, fails as a matter of law. Therefore, the Court will not consider whether Plaintiff has alleged the elements of these claims to the extent that they are cognizable.

Coleman Defendants.[8]  It is the Coleman Defendants who allegedly took twenty percent of

Plaintiff's earnings in addition to other property without authorization and the Coleman

Defendants who allegedly engineered the scheme to keep Plaintiff incarcerated by falsely

accusing him of making threats.  Therefore, the state claims against the Coleman Defendants will

not be dismissed.

### C. SECTION 1983 CLAIMS

A plaintiff may bring a claim under 42 U.S.C. § 1983 by alleging that a person

acting under color of state law deprived him of rights, privileges, or immunities secured by the

Constitution. Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993).  Section 1983 is not itself a

source of substantive rights; to establish a claim, a plaintiff must allege a violation of federal

rights established "elsewhere in the Constitution or the federal laws." Kneipp v. Tedder, 95 F.3d

1199, 1204 (3d Cir. 1996)

Liability under section 1983 cannot rest solely on respondeat superior.  A

defendant must have personal involvement in the alleged constitutional violation to be held

liable. Rode v. Dellarciprete, 845 F.2d 1195, 1209 (3d Cir.1988).  However, "'[a]ctual

knowledge and acquiescence' suffices for supervisory liability because it can be equated with

'personal direction' and 'direct [action] by the supervisor.'" Robinson v. City of Pittsburgh, 120

F.3d 1286, 1294 (3d Cir. 1997), abrogated on other grounds by Burlington N. & Santa Fe Ry.

---

[8] To the extent that Plaintiff makes a claim of defamation, the claim is dismissed against
all defendants because sovereign immunity protects all the defendants except the Coleman
Defendants, and the Coleman Defendants are not implicated in Plaintiff's defamation claims.  To
the extent that Plaintiff claims there was a breach of contract, this too is dismissed as to all
defendants.  A breach of contract claim would be frivolous because Plaintiff has not alleged the
formation of a contract.

Co., 126 S. Ct. 2405 (2006) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)).

Plaintiff claims that the defendants violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  Plaintiff alleges the same facts as the bases for each of these claims and has failed to explain in detail how the defendants' conduct deprived each individual right.  The Court has examined each claim and has applied the most relevant law based on Plaintiff's allegations.  Plaintiff has withdrawn his claim under the Fifth Amendment. (See Pl.'s Answer to Original Commonwealth Defs.' Mot. Dismiss 3.)  The others are considered in turn.

### 1. FIRST AMENDMENT

The only viable First Amendment claim by Plaintiff appears to be that he was retaliated against for making constitutionally protected statements.  The elements for a retaliation claim under the First Amendment are as follows:

> (1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'

Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir.2001)).  Plaintiff alleges that he filed grievances and, aside from receiving no response, the Defendants retaliated against him by, among other things, arresting him for parole violations, forcing him to start over within the Coleman Center's program, refusing to perform home studies, and otherwise preventing him from completing his sentence.

The Coleman Defendants argue that Plaintiff did not engage in constitutionally protected conduct.  However, the Third Circuit has clearly held that when prisoners file

20

complaints or grievances they are engaging in constitutionally protected activity. See Robinson v. Taylor, 204 Fed. Appx. 155, 157 (3d Cir. 2006) ("[Plaintiff's] filing of a grievance to complain about [Defendant's] behavior is constitutionally protected conduct."); Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) ("[Plaintiff's] allegation that he was falsely charged with misconduct in retaliation for filing complaints against Officer Wilson implicates conduct protected by the First Amendment."); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) ("We have . . . held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts.").

Plaintiff's allegations also establish the second element—that the defendants took adverse action.  Specifically, Plaintiff has alleged that he was arrested three times, twice being sent back to prison and once being confined in PennCapp.  As the Third Circuit has stated, "several months in disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights." Mitchell, 318 F.3d at 530.  Moreover, this Court concludes that by forcing Plaintiff to start over at "phase one," and refusing to do a "home study," defendants may have taken further adverse acts.  It is not entirely clear what it means to have to start from phase one, but there is at least an issue of fact that by starting the program from the start, Plaintiff's overall confinement was lengthened significantly because he had to proceed through the stages that he had already completed.  Similarly, when the Defendants refused to perform a home study, it appears that they contributed to Plaintiff's continued confinement.  The Court makes no finding here as to whether these are in fact adverse acts, only that at the motion to dismiss stage it is disputable that they would deter a reasonably firm prisoner from exercising his First Amendment rights.

21

Plaintiff's allegations have also established the final element of a retaliation claim—a causal nexus between the constitutionally protected activity and the adverse action. In Mitchell, a case that reversed a district court's finding that the plaintiff's claims were frivolous, the Third Circuit determined "that the word 'retaliation' in [Plaintiff's] complaint sufficiently implies a causal link between his complaints and the misconduct charges filed against him." Id. The court noted that it would have "prefer[red] that [Plaintiff's] complaint be more detailed, [but] we take seriously our charge to construe pro se complaints nonrestrictively." Id. Here, not only does Plaintiff state the word retaliation, but he makes allegations that various defendants warned him not to make grievances; that he was told that certain defendants were angry with him for his grievances; and that other residents were treated differently, suggesting that the defendants may have targeted Plaintiff specifically.

While Plaintiff has alleged a cause of action for retaliation in violation of his First Amendment rights, he has not alleged "personal involvement" on the part of all the defendants. The first alleged retaliatory act occurred on September 1, 2004 when Plaintiff was arrested and as a result was sent back to prison for several months. Plaintiff's allegations implicate only Alvarado and Casillas. On his return to the Center, Plaintiff had to start again at phase one. The allegations indicate that defendants King and Arroyo were involved in making this decision. The second alleged arrest again implicates Alvarado and Casillas, but also implicates King, whom Plaintiff alleges manufactured the story of a cell phone found in Plaintiff's possession. The decision to force Plaintiff to start from phase one of the program again appears to have been made by Lane and Troppauer this time. The final alleged arrest, made January 11, 2006, implicates several more defendants. Plaintiff alleges that Morrison, Russell, Alvarado, and

22

Casillas conspired to retaliate against plaintiff for filing a grievance concerning Russell's search of Plaintiff.

Because Plaintiff does not allege personal involvement, either directly or by showing direct knowledge or acquiescence, the First Amendment claim is dismissed as to Taylor and Carey; all of the Additional Commonwealth Defendants; the CEC; and Johnson and Rogers of the Coleman Defendants.

### 2. FOURTH AMENDMENT

Plaintiff's allegations conceivably implicate the Fourth Amendment in a few ways. The Fourth Amendment generally prohibits unreasonable searches. Defendant Russell searched Plaintiff on January 9, 2006. However, a prisoner does not have the same expectation of privacy as free individuals and therefore "the Fourth Amendment proscription against unreasonable searches does not apply." Hudson v. Palmer, 468 U.S. 517, 526 (1984). To promote the security of a prison and the safety of inmates, random searches of inmates are considered necessary. Id. at 529. The reasoning of this rule applies equally to halfway houses. Plaintiff does not allege that the search was unreasonably conducted other than asserting that Russell was unprofessional and rude. Therefore, this search does not provide a basis for relief under the Fourth Amendment.

Plaintiff also alleges that his three "arrests" were not supported by probable cause. To the extent that plaintiff brings a Fourth Amendment malicious prosecution claim, this claim must be dismissed because he has not alleged the necessary element that there was a "'termination of [a] prior criminal proceeding in favor of the accused.'" Donahue v. Gavin, 280 F.3d 371, 383 (3d Cir. 2002) (quoting Heck v. Humphrey, 512 U.S. 477, 484 (1994)).

Additionally, plaintiff's "arrests" occurred while he was in the state prison system. He was

serving a portion of his sentence in one facility—the Coleman Center. He was then charged

three times with technical violations, which resulted in removal from the Coleman Center to

another facility. This type of "arrest" is not a seizure for Fourth Amendment malicious

prosecution purposes. See Rauso v. Romero, No. 03-5810, 2005 WL 1320132, at *2 (E.D. Pa.

June 2, 2005) ("[P]laintiff did not sustain a 'deprivation of liberty consistent with the concept of

a seizure' in connection with the hearing or the rescission of parole [from a Community

Corrections Center,] since he was already in prison at the time." (quoting Donohue v. Gavin, 280

F.3d 371, 380 (3d Cir. 2002)); see also Holmes v. Grant, No. 03 Civ. 3426, 2006 WL 851753, at

*14 (S.D.N.Y. Mar. 26, 2006) ("An inmate already incarcerated has not suffered any

unconstitutional deprivation of liberty as a result of being charged with new criminal offenses

and being forced to appear in court to defend himself.").

Plaintiff may also be bringing a false arrest claim in connection with these three

arrests. "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under

§ 1983 for false imprisonment based on a detention pursuant to that arrest." Groman v. Twp. of

Manalapan, 47 F.3d 628, 636 (3d Cir.1995). However, if an arrest within the prison system does

not constitute a seizure for purposes of malicious prosecution, the logic extends to a false arrest

claim as well. Therefore, both the malicious prosecution and false arrest claims are without

merit.

Accordingly, Plaintiff's Fourth Amendment claims are dismissed as to all

Defendants.

### 3. EIGHTH AMENDMENT

The Eighth Amendment, which prohibits cruel and unusual punishment, imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmate." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). To state a claim under the Eighth Amendment, there are two elements: (1) an objective element—"whether the constitutional deprivation was sufficiently serious;" and (2) a subjective element—"whether the official had a 'sufficiently culpable state of mind.'" McGrath v. Johnson, 67 F. Supp. 2d 499, 513 (quoting Young v. Quinlan, 960 F.2d 351, 360 (3d Cir. 1993)). To be a sufficiently serious deprivation, the conditions must fail to meet "the minimal civilized measure of life's necessities." Farmer v. Brennan, 511 U.S. 825, 834-35 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). As to the question of what is a sufficiently culpable state of mind, "the named defendants in a case [must] have, and disregard, actual knowledge of a serious risk of harm" to the inmates. Kemp v. Hatcher, No. 96-7, 1996 WL 612834, at *2 (E.D. Pa. Oct. 25, 1996).

Plaintiff appears to argue that the conditions at the Coleman Center were unsanitary and inhumane as evidenced by the fact that he was twice bitten by spiders, once when going to the bathroom outside the kitchen, and another time while in his sleeping quarters. He alleges that the spider bites caused him injuries requiring hospital treatment. He further alleges that he made complaints about the spiders after each incident, yet no action was taken

Plaintiff's allegations are not sufficiently serious to withstand a motion to dismiss. Plaintiff volunteered as a kitchen worker and knew that there were no restroom facilities. Because he was not forced to be in the kitchen, the conditions there do not constitute cruel and

25

unusual punishment. See <u>Holmes v. Sheldon-Kloss</u>, No. 07-cv-00740, 2007 WL 2753173, at *1

( E.D. Pa. Sept. 20, 2007) (concluding that an injury caused by voluntary janitorial work did not

constitute cruel and unusual punishment); <u>see also</u> <u>Ward v. Lamanna</u>, No. 04-11, 2007 WL

791130, at *8 (W.D. Pa. Mar. 14, 2007) (noting some disagreement among other courts as to

whether voluntarily engaging in an activity forecloses a cruel and unusual punishment claim and

concluding in that case that it did).  One spider bite in Plaintiff's sleeping quarters also does not

constitute a sufficient deprivation in and of itself.  Even if it did, there are no allegations that any

of the Defendants had actual knowledge of an infestation in the sleeping quarters of the Coleman

Center prior to Plaintiff being bitten.  Therefore, Plaintiff's Eighth Amendment claim is

dismissed as to all Defendants.

### 4. FOURTEENTH AMENDMENT

Plaintiff also raises claims under the Due Process and Equal Protection Clauses of

the Fourteenth Amendment.  To establish a procedural Due Process claim[9] a plaintiff must allege

(1) the existence of a protected liberty interest that has been interfered with by the state and (2)

procedures related to the deprivation that were constitutionally insufficient. <u>Sample v. Diecks</u>,

885 F.2d 1099, 1113 (3d Cir.1989).  As to the first of these elements, "[s]uch a 'liberty interest'

---

[9] To the extent that Plaintiff raises a substantive due process claim, it is without merit. The only specific substantive due process right cited by Plaintiff is access to the courts. (Pl.'s Answer to Original Commonwealth Defs.' Mot. Dismiss Pl.'s Am. Compl. 6.) But Plaintiff does not allege anywhere in his pleadings that he was denied access to the courts. To the extent that his other claims might rest on substantive rights guaranteed by the Due Process Clause, they are better considered under other provisions of the Bill of Rights and state law, such as the First Amendment and Eighth Amendment, considered above. <u>See</u> <u>Goldhaber v. Higgins</u>, No. 06-134J, 2007 WL 2907209, at *31 (W.D. Pa. Sept. 28, 2007) ("The generalized, imprecise notion of 'substantive due process' is inapplicable where a particular provision of the Bill of Rights is directly applicable to a claim." (citing <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994)).

may be derived from one of two sources:  The interest may be of such a fundamental nature that it inheres in the Constitution itself or it may be created by state law." McGrath, 67 F. Supp. 2d at 514.

Here, Plaintiff has alleged that he was deprived of a liberty interest when on three occasions his parole status in a halfway house was revoked.[10]  Courts in the Third Circuit, following the Supreme Court, have held that "[t]he conditional freedom of a parolee is a liberty interest protected by the due process clause of the Fourteenth Amendment." See, e.g., Hawkins v. Pa. Bd. of Prob. and Parole, No. 07-0552, 2007 WL 1852822, at *4 (E.D. Pa. June 26, 2007) (citing Morrissey v. Brewer, 408 U.S. 471, 482-88 (1972)).  However, the Third Circuit, again applying Supreme Court precedent, has stated that a "prisoner does not have a liberty interest in remaining in a preferred facility within a state's prison system." See Asquith v. Dep't of Corr., 186 F.3d 407, 411 (3d Cir. 1999) (citing Montanye v. Haymes, 427 U.S. 236, 242 (1976)).  The Third Circuit has concluded that living in a halfway house aligns more closely with being in prison because it "amount[s] to institutional confinement," and "while a prisoner remains in institutional confinement, the Due Process Clause does not protect his interest in remaining in a particular facility." Id.  Thus Plaintiff has alleged no liberty interest that inheres in the Constitution.  Nor is there a viable state law-created right implicating the due process clause. See

---

[10]  To the extent that Plaintiff is arguing that his missing property constitutes a deprivation under the Due Process Clause, this too fails.  Where there exists an applicable state tort remedy—in this case conversion—a claim brought under the Due Process Clause is inappropriate. See Meyer v. Dep't of Corr., No. 06-117, 2006 WL 890917, at *1 (D. Del. Mar. 27, 2006) (concluding that because Plaintiff "has available to her the option of filing a common law claim for conversion of property," she "cannot maintain a cause of action pursuant to § 1983." (citing Hudson v. Palmer, 468 U.S. 517, 535 (1984)).

Ogrod v. United States, No. 06-5496, 2007 WL 2319766, at *3 (E.D. Pa. August 10, 2007) (concluding that there could be no state-created due process right involving revocation of parole status from a halfway house because a decision to revoke was not an "'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'" (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995))). Therefore, Plaintiff's procedural due process claim is dismissed as to all Defendants because he has not alleged the deprivation of a liberty interest.

Plaintiff's Fourteenth Amendment equal protection claim, however, will not be dismissed. The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813 (1996). To successfully allege an equal protection claim, a plaintiff must show the following:

> (1) the complaining person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

Sabatini v. Reinstein, No. 99-2393, 1999 WL 636667, at *2 (E.D. Pa. Aug. 20, 1999). Here, Plaintiff has alleged that he and others were treated differently because they were African American. Plaintiff alleges that others who were not African American were treated more favorably with respect to providing case conferences when there was a problem and performing home visits to more quickly transition them out of the Coleman Center. Plaintiff also alleges that some of the defendants arrested him and others in part based on racial animus. These allegations sufficiently state a claim under the Equal Protection Clause. Compare Thomas v. Independence Twp., 463 F.3d 285, 297-98 (3d Cir. 2006) (concluding that Plaintiff stated a cognizable equal protection claim where the complaint averred that defendants "engaged in . . . misconduct 'solely

based upon Mr. Thomas' race and ancestry,' and that plaintiffs are 'subject to the exercise of

police and official power and actions to which similarly situated persons are not subject'"

(quoting the complaint)), with Williams v. Wickiser, 2007 WL 3125019, at * 9  (M.D. Pa. 2007)

(dismissing an equal protection claim where Plaintiff did not allege either that "he was being

treated differently than other similarly situated inmates . . . [or] that Defendants treated him

differently  . . . based on his race, gender, or nationality").

      Plaintiff alleges the personal involvement of Alvarado, Casillas, King, Arroyo,

Lane, Morrison, Russell, and Troppauer only—the same group that he alleged retaliated against

him.  Therefore, Plaintiff's equal protection claim is dismissed against Taylor and Carey; all of

the Additional Commonwealth Defendants; the CEC; and Johnson and Rogers of the Coleman

Defendants.

### D.  SECTION 1985(3) CONSPIRACY CLAIM

      To state a claim under section 1985(3), a plaintiff must allege four things: (1) a

conspiracy; (2) motivated by a racial or class-based discriminatory animus designed to deprive,

directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an act

in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any

right or privilege of a citizen of the United States. Herring v. Chichester Sch. Dist., No. 06-5525,

2007 WL 3287400, at *8 (E.D. Pa. Nov. 6, 2007).  The Supreme Court has stated "that there

must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind

the conspirators' action" to state a claim under section 1985. Bray v. Alexandria Women's

Health Clinic, 506 U.S. 263 (1993). As discussed above with respect to Plaintiff's equal

protection claim, Plaintiff has sufficiently alleged that certain defendants were racially motivated

in taking adverse actions against him.

The focus of the various defendants' arguments is that Plaintiff fails to plead with particularity, as required in a section 1985(3) claim. "To plead conspiracy under Section 1985(3), a complaint must allege specific facts suggesting there was a mutual understanding among the conspirators to take actions directed toward an unconstitutional end." <u>Lamb Found. v. North Wales Borough</u>, No. 01-950, 2001 WL 1468401, at *15 (E.D. Pa. Nov. 16, 2001). The Court concludes that Plaintiff has alleged sufficient facts to satisfy section 1985(3)'s pleading requirements. He has alleged that people of other races were treated differently, that groups of defendants at various times threatened him for filing grievances, and he has further alleged that he was told that certain defendants had conspired to have him removed from the Center back to prison. At this stage, these allegations provide enough detail to support a conspiracy claim under section 1985(3).

This claim implicates the same defendants as the equal protection claim— Alvarado, Casillas, King, Arroyo, Lane, Morrison, Russell, and Troppauer. Therefore, the section 1985(3) claim is dismissed as to Taylor and Carey; all of the Additional Commonwealth Defendants; the CEC; and Johnson and Rogers of the Coleman Defendants.

## IV. CONCLUSION

For the reasons stated above, the Court grants Defendants' Motions to Dismiss in part, and denies the Motions in part. An Order consistent with this Memorandum follows.

.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANA CARTER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  06-3000 |
| | : | |
| v. | : | |
| | : | |
| RONALD MORRISON, | : | |
| MANNY ARROYO, | : | |
| BERNON LANE, | : | |
| PAMELA BROWN, | : | |
| PATRICIA JOHNSON, | : | |
| LENORA KING, | : | |
| LAUREN TROPPAUER, | : | |
| JUNIUS RUSSELL, | : | |
| COMMUNITY EDUCATION CENTERS, | : | |
| MONIQUE ROGERS, | : | |
| JOSE ALVARADO, | : | |
| ELDA CASILLAS, | : | |
| FREDDIE HARRIS, | : | |
| THOMAS COSTA, | : | |
| PAUL O'CONNOR, | : | |
| LAWRENCE MURRAY, | : | |
| DALE EVANS, | : | |
| LAUREN TAYLOR, | : | |
| MARK CAREY, | : | |
| WILLIE JONES, | : | |
| JULIE STOWITZKY, | : | |
| THOMAS PEKAR, | : | |
| JEFFREY BEARD, | : | |
| EVANS GARY, | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

AND NOW, this 28th day of November, 2007, upon consideration of Defendants

31

O'Connor, Alvarado, and Casillas's Motion to Dismiss, in part, pursuant to Fed. R. Civ. P.

12(b)(6) (Docket No. 41), Plaintiff's Answer thereto (Docket No. 46), and Defendants O'Connor,

Alvarado, and Casillas's Reply to Plaintiff's Answer (Docket No. 47); Defendants King,

Troppauer, Russell, Morrison, Arroyo, Lane, and Johnson's Motion to Dismiss pursuant to Fed.

R. Civ. P. 12(b)(6) and Motion to Strike the Amended Complaint pursuant to Fed. R. Civ. P.

12(f) (Docket No. 55), and  Plaintiff's Declaration in Opposition (Docket No. 70); Defendants

Costa, Murray, Stowitzky, Beard, and Gary's Motion to Dismiss pursuant to Fed R. Civ. P.

12(b)(6) (Docket No. 56) and Plaintiff's Declaration in Opposition (Docket No. 69); Defendant

Taylor's Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(6) (Docket No. 57) and Plaintiff's

Declaration in Opposition (Docket No. 67); Defendant Carey's Motion to Dismiss pursuant to

Fed R. Civ. P. 12(b)(6) (Docket No. 61) and Plaintiff's Declaration in Opposition (Docket No.

68); Defendants Community Education Centers and Monique Rogers's Motion for Joinder of

Defendants King, Troppauer, Russell, Morrison, Arroyo, Lane, and Johnson's Motion to Dismiss

pursuant to Fed. R. Civ. P. 12(b)(6) and Motion to Strike the Amended Complaint pursuant to

Fed. R. Civ. P. 12(f), it is hereby **ORDERED**:

       1. The Motion to Strike the Amended Complaint (Docket No. 55) is **DENIED**;

       2. Defendant Taylor's Motion to Dismiss (Docket No. 57) is **GRANTED** as to all

of Plaintiff's claims;

       3. Defendant Carey's Motion to Dismiss (Docket No. 61) is **GRANTED** as to all

of Plaintiff's claims;

       4. Defendants Costa, Murray, Stowitzky, Beard, and Gary's Motion to Dismiss

(Docket No. 56) is **GRANTED** as to all of Plaintiff's claims;

32

5. Defendant O'Connor's Motion to Dismiss (Docket 41) is **GRANTED** as to all of Plaintiff's claims;

6. Defendants Alvarado and Casillas's Motion to Dismiss (Docket No. 41) is **DENIED** as to Plaintiff's claims brought under 42 U.S.C. § 1983 and the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment; and Plaintiff's claim brought under 42 U.S.C. § 1985(3). As to all of Plaintiff's other claims, Defendants Alvarado and Casillas's Motion to Dismiss is **GRANTED**.

7. Defendants Morrison, Arroyo, Lane, Troppauer, King, and Russell's Motion to Dismiss (Docket No. 55) is **DENIED** as to all of Plaintiff's state law claims other than his Defamation and Contract claims; Plaintiffs section 1983 claims brought pursuant to the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment; and Plaintiff's claim brought under 42 U.S.C. § 1985(3). As to all of Plaintiff's other claims—including his Defamation and Contract claims—Defendants Morrison, Arroyo, Lane, Troppauer, King, and Russell's Motion to Dismiss is **GRANTED**.

8. Defendant Johnson's Motion to Dismiss (Docket No. 55) is **DENIED** as to all of Plaintiff's state law claims other than his Defamation and Contract claims. As to all of Plaintiff's other claims—including his Defamation and Contract claims—Defendant Johnson's Motion to Dismiss is **GRANTED**.

9. Defendants Rogers and the Community Education Center's Motion to Dismiss (Docket Nos. 55, 68) is **DENIED** as to all of Plaintiff's state law claims other than his Defamation and Contract claims. As to all of Plaintiff's other claims—including his Defamation and Contract claims—Defendants Rogers and the Community Education Center's Motion to

33

Dismiss is **GRANTED**.

BY THE COURT:

RONALD L. BUCKWALTER, S.J.