**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANA CARTER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-3000 |
| | : | |
| v. | : | |
| | : | |
| RONALD MORRISON, | : | |
| MANNY ARROYO, | : | |
| BERNON LANE, | : | |
| LAUREN TROPPAUER, | : | |
| LENORA KING, | : | |
| JUNIUS RUSSELL, | : | |
| PAMELA BROWN, | : | |
| NICOLE JOHNSON, | : | |
| MONIQUE ROGERS | : | |
| COMMUNITY EDUCATION CENTER, INC., | : | |
| JOSE ALVARADO, | : | |
| ELDA CASILLAS, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                            February 24, 2010

Pro se Plaintiff Dana Carter filed this section 1983 action to assert alleged civil rights

violations arising from his parole and assignment to the Joseph E. Coleman Center ("Coleman

Center"), a community corrections center. At this stage of the case, two groups of Defendants

remain, Parole Agent Jose Alvarado and Parole Supervisor Elda Casillas for the Pennsylvania

Board of Probation and Parole ("Commonwealth Defendants") as well as employees and the

corporate entity of the Joseph E. Coleman Community Center (Defendants Ronald Morrison,

Manny Arroyo, Bernon Lane, Lauren Troppauer, Lenora King, Junius Russell, Pamela Brown,

Nicole Johnson, and Community Education Center, Inc., collectively referred to as "CEC Defendants"). Currently before the Court are CEC Defendants' Motion for Summary Judgment; Commonwealth Defendants' Motion for Summary Judgment; and Plaintiff Carter's respective Responses in Opposition.[1] For the reasons stated below, Defendants' Motions for Summary Judgment are granted.

## I.    FACTUAL BACKGROUND

On October 22, 2003, the Pennsylvania Board of Probation and Parole ("the Board") approved Plaintiff's release and assignment to Coleman Center. (CEC Mot. Summ. J., Ex. B at CEC 005.) Following his release from State Correctional Institution – Greene ("SCI-Greene"), Plaintiff arrived at Coleman Center on March 1, 2004. (Commonwealth Defs.' Mot. Summ. J., Ex. 4, Carter Dep. 40:23-41:10, June 9, 2009.) The Board issued Plaintiff certain Special Conditions to his parole on February 27, 2004. (CEC Mot. Summ. J., Ex. B at CEC 001.) Plaintiff acknowledged receipt and understanding of the Special Conditions via signature. Id. Among other provisions, the Special Conditions provided that removal or termination from Coleman Center for any reason other than successful completion of its program would constitute a violation of Plaintiff's parole. (Id. at CEC 002.) The Conditions further provided that any violation of the Coleman Center's rules may constitute a violation of parole and result in arrest. (Id. at CEC 005.)

---

[1] Also before the Court are Plaintiff's Motions to Dismiss for procedural objections to the form of Defendants' Summary Judgment Motions, and Defendants' Responses in Opposition to Plaintiff's Motions to Dismiss.

## A. Initial Grievances and CEC Response

While at Coleman Center in 2004, Plaintiff filed request forms and grievances relating to CEC Defendants on behalf of himself and other inmates.[2]  Plaintiff used these request forms to claim benefits that he alleged the CEC Defendants had failed to provide for him or his fellow parolees, and grievances to complain of allegedly harmful practices at the Coleman Center. (Carter Dep. 53:15-62:06; Carter Aff. 1, June 28, 2006.)  During his first month at the Coleman Center, Plaintiff avers that he "filed a total of fifteen request[s] to staff and seven grievances." (Carter Aff. 1.)

On July 1, 2004, Defendants King, Brown, and Arroyo called Plaintiff into an office and told him that "they were displeased with [his] activities," a reference – Plaintiff believes – to the grievances Plaintiff filed in regards to the Coleman Center.  (Carter Dep. 66:06-67:07.) On behalf of those present, Defendant Arroyo further stated to Plaintiff during the meeting that "they were very concerned that [Plaintiff was] jeopardizing [his] stay there and that [Plaintiff] was just like the rest, to stop complaining.  (Id.; Carter Aff. 2).

## B.  Shooting at CEC

On July 11, 2004, as he was preparing to leave Coleman Center on a social pass around 8:00 a.m., Plaintiff heard a gunshot down the hall from the room where he slept.  Soon after hearing the gunshot, Plaintiff left the Coleman Center.  On his way out, Plaintiff dialed 911 to report the shooting from a pay phone in the Center's lobby.  (Carter Aff. 2.)  Later that night,

---

[2] Although Plaintiff provided only one copy of a grievance or request form from 2004, Plaintiff swore to their existence in the Affidavit submitted with his Complaint and in the June 9, 2009 Deposition.  (Carter Aff. 1, June 28, 2006 (Attached to Compl.); Commonwealth Defs.' Mot. Summ. J., Ex. 4, ("Carter Dep.") 61:15-62:06, June 9, 2009.)

upon his return to the Coleman Center, Plaintiff discovered that a parolee had been shot and killed at the Center.  (Id.)  The next day Plaintiff informed Defendant Alvarado that Plaintiff feared for his safety at the Center.  (Carter Aff. 2;  (Commonwealth Defs.' Mot. Summ. J., Ex. 1 ("Alvarado  Decl.") ¶¶ 3-4.)) Plaintiff then requested that Defendant Alvarado transfer him to another community corrections center.  (Carter Aff. 2.)  Defendant Alvarado asked Plaintiff if the incident had anything to do with Plaintiff.  Plaintiff responded in the negative.  (Alavardo Decl. ¶ 5, Ex. A.)  Alvarado then inquired if Plaintiff had been threatened or if there is an immediate threat to his life in the Center.  Plaintiff also responded in the negative. (Alavardo Decl. ¶ 5, Ex. A.)  Subsequently, Alvarado denied Plaintiff's transfer request and told Plaintiff to return to Coleman Center as usual.  (Id.)  Alvarado assured Plaintiff that the incident in question was being properly addressed, and if any legitimate threats to Plaintiff should arise, to inform Alvarado and the Coleman Center immediately.  (Id.)

The shooting incident spurred Plaintiff to contact his government representatives concerning the conditions at Coleman Center.  Plaintiff wrote letters to, among others, Pennsylvania State and Congressional Representatives as well as the Governor concerning his complaints with Coleman Center.  (Carter Aff. 1-2; Carter Dep. 72:05-72:19.)  Defendants Arroyo, Morrison, Brown and Alvarado received copies of these letters.[3]  (Carter Aff. 1; Carter Dep. 72:05-72:19.)  As a result of Plaintiff's campaign to file request forms and grievances and encouragement of other parolees to do the same, "the [Coleman] Center started receiving

_____

[3] Defendant Parole Agent Alvarado began supervising Plaintiff on May 13, 2004. (Alvarado Decl. ¶¶ 3-4.)

telephone calls from state reps and others about resident complaints and conditions at the Center." (Carter Aff. 2.)

### C. First Parole Violation: Possession of Sensitive Identification Information

Towards the end of August 2004, Defendant Alvarado received a telephone call from Plaintiff's then-employer, LP Group, about a potential violation of parole conditions. (Alvarado Decl. ¶¶ 6-9.) Plaintiff's personal address book had been found on August 24, 2004, after it had been left in the men's bathroom at the Connection Training Education Program ("CTEP"). (Alvarado Decl. ¶¶ 6-9, Ex. F.; Commonwealth Defs.' Mot. Summ. J., Ex. 2 ("Alvarado Resp."), Ex. A.) After recovering the address book, CTEP staff discovered that it contained sensitive identification information of one Coleman Center staff member and three Coleman Center parolees. (Alvarado Decl. ¶¶ 6-9, Ex. D; Alvarado Resp. Ex. A.) The identification information consisted of personal cellular phone numbers, names, dates of birth, social security numbers, drivers' license numbers, and credit card numbers. (Id.) In a meeting with CTEP administrative staff, LP Group employees, and Plaintiff, Plaintiff first admitted to obtaining the information from the individuals' W-2 forms for illegal purposes. Plaintiff then claimed that two men had given him permission to possess their sensitive information, but that he forget to inform the other two individuals that he had their personal information. Plaintiff finally claimed that he had only intended to help the individuals whose personal information he possessed to straighten out their credit. (Alvarado Decl. ¶ 7, Ex. B, C.)

As a result of the discovery of his address book containing sensitive identification and credit card numbers, Plaintiff was discharged "unsatisfactorily," on September 1, 2004, from the Coleman Center for "violating program rule under the title, Major Rules and Procedural

Infractions, II., P," which prohibits "[p]ossession, use, removal of, or tampering with confidential or unauthorized material in Coleman Hall's possession . . . ." (CEC Mot. Summ. J., Ex. B at CEC 039 (Letter from CEC Defendant King to Commonwealth Defendant Alvarado.); Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. W at 20 (Community Education Center's "Coleman Hall" Resident Handbook.)) On September 1, 2004, Alvarado arrested Plaintiff at the Coleman Center for two parole violations: obtaining sensitive information in violation of Coleman Center rules and failing to be successfully discharged from the Coleman Center. (Alvarado Decl. ¶¶ 9, 11, Ex. D; Pl.'s Resp. CEC Defs.' Mot. Summ. J. 7-11.) The Parole Board then remanded Plaintiff to State Correctional Institution - Graterford ("SCI-Graterford") pending resolution of his parole violation.

On September 8, 2004, Alvarado served Plaintiff with a Notice of Charges and Hearings form, which Plaintiff signed and dated. (Alvarado Decl., ¶ 11, Ex. D; Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. B ("Notice of Charges and Hearing").) That same day a preliminary hearing was conducted at SCI-Graterford and, during the hearing, Plaintiff requested a "full panel hearing" on his violation. (Alvarado Decl. ¶¶ 12, 14.) Plaintiff began his wait for this full hearing, and, on November 15, 2004, Alvarado sent an e-mail to inquire if any date had been scheduled. (Id. ¶ 13, Ex. E.) On January 7, 2005, Plaintiff filed a motion to dismiss the parole violation charges due to the Probation Board's failure to comply with its own regulation requiring a full hearing on parole violations within 120 days of a request for such a hearing. (Pl.'s Resp. CEC Defs.' Mot. Summ. J. 3, Ex. F.) Subsequently, on January 27, 2005, Plaintiff was released from incarceration to the Coleman Center, because the Probation Board failed to hold a full panel hearing within 120 days of Plaintiff's parole violations. (Alvarado Decl. ¶ 14,

Ex. F.)

### D. Return to Coleman Center and New Grievances

Upon his return to Coleman Center, Plaintiff acknowledges that he became subject to the same special conditions of parole, which provided that a violation of Coleman Center program rules as well a discharge from the Coleman Center for any other reason than successful completion of the program would constitute a violation of Plaintiff's parole. (Carter Dep. 75:3-76:20.)

### 1. Program Phase Grievance

Plaintiff was required to begin the program from the orientation phase, although he had been through the orientation before, had progressed to phase three (out of four) during his previous participation in the Coleman Center program, and had his parole violation dismissed for a procedural defect. (Pl.'s Resp. CEC Defs.' Mot. Summ. J. at 5, Ex. G.; Carter Aff. 3.) Plaintiff complained about his placement in Phase One to CEC Defendants through formal grievances and to Defendant Alvarado, who told Plaintiff that he would look into the situation. (CEC Defs.' Mot. Summ. J., Ex. H; Alvarado Decl. Ex. A.) Defendant Alvarado's records also demonstrate that he told Plaintiff he would talk to CEC Defendants to see if it would be possible for Plaintiff to start the Center's program where he last left off. (Alvarado Decl. Ex. A.)

### 2. Assorted Grievances and Requests

From January through June 2005, Plaintiff filed numerous request forms and grievances with the Coleman Center relating to services Plaintiff believed the Center wrongly denied or errors that the Center had committed in administering its program. (Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. H.) The request forms and grievances addressed a wide range of subjects: use of

a fitness club three times a week as opposed to one, scheduling of a progress meeting, placement in phase three as opposed to phase one of the program, an explanation of the "phase procedure" upon a dismissal of parole violation charges and return to Coleman Center, improper restrictions on his ability to leave the Center on a day pass, transfer to a mental health room, failure to process Plaintiff's rent exemption request, credit for community service performed, and use of his typewriter. (Id.) Defendant Brown responded to a number of Plaintiff's request forms and grievances by validating the Center's actions with brief explanations of Coleman Center's policy or by advising Plaintiff that she had not received the paperwork Plaintiff referenced in his grievances. (Id.) At other times, from the record before the Court, it appears that certain requests and grievances went unanswered. It is not clear to what extent Plaintiff followed up his unanswered grievances by contacting Coleman Center staff. The Court notes, however, that in one instance Plaintiff filed a request form asking the Center if they had received other requests and, if so, to respond accordingly, to which Defendant Brown replied, "I already responded." (Id.) Moreover, according to Defendant Alvarado's records, Plaintiff's request was granted on at least one occasion, since by May 24, 2005 Plaintiff had been transferred to the Mental Health Unit. (Alvarado Decl. Ex. A.)

### 3. Arroyo Confrontation

At some point during 2005, after Plaintiff had returned to Coleman Center from his first parole violation, Defendant Arroyo confronted Plaintiff about his second stay at Coleman Center. (Carter Dep. 122:12-123:11.) Plaintiff testified in his deposition that Defendant Arroyo saw Plaintiff sitting outside the medical center and sat down beside Plaintiff. Defendant Arroyo told Plaintiff that "it's good to see you back." The two had a conversation, in which Defendant

Arroyo proposed a hypothetical to Plaintiff. Defendant Arroyo asked, "what if someone had burglarized your home and he came back in the neighborhood, wouldn't you be upset towards him?" (Id.) Upon Defendant Arroyo's prodding, Plaintiff responded, "I would be a little upset about it and I wouldn't want that person around the neighborhood anymore." (Id.) Defendant Arroyo ended the conversation on that note. Plaintiff believes this hypothetical was a reference to his return to the center after his parole violation for possession of sensitive identification and credit information for a CTEP staff member and a few Coleman Center residents. (Id.)

### 4. Home Plan Rejection Grievance

On February 11, 2005, Plaintiff submitted a home plan, which is a proposal for a living arrangement outside Coleman Center. (Alvarado Decl. ¶ 15.) The home plan indicated that Plaintiff would reside with his uncle in a one-bedroom apartment located on West Walnut Lane in Philadelphia. (Commonwealth Defs.' Mot. Summ. J., Ex. 1-G .) Defendant Alvarado investigated the home plan by speaking with Plaintiff's uncle and the landlord of the apartment. (Id.) In talking with the landlord, Defendant Alvarado discovered that Plaintiff's uncle was roughly eight months behind in rent and that the landlord would not allow Plaintiff to live in the apartment due to Plaintiff's criminal history. (Id.) Defendant Alvarado, thus, disapproved Plaintiff's home plan. (Id.)

### 5. Employment Grievance

Later that year, in May, 2005, "an environmental job service had placed [Plaintiff] at the Philadelphia Naval Base making $12.00 an hour for nine hours a day, seven days a week."

(Carter Aff. 4.)[4]  On May 12, 2005, Defendant Alvarado spoke with an employee of Kvaerner

Shipyard in regards to a potential job that Plaintiff was pursuing at that site.  From this phone

conversation, Alvarado learned that Plaintiff had only applied for a temporary position that could

only last up to six months, that the job site could be in Philadelphia or another Kvaerner location,

that Kvaerner had given Plaintiff only an opportunity to interview and not an offer of

employment, and that "it would be highly unlikely Plaintiff would get a job with [Kvaerner]

simply because [Plaintiff] is currently on parole."  (Alvarado Decl. Ex. A.)

### E.  Second Parole Violation:  Multiple Rules and Procedures Infractions

During July 2005, Plaintiff committed a series of infractions that culminated in his

unsatisfactory discharge for violation of parole conditions on July 14, 2005.  On July 6, 2005,

Defendant Brown sent an e-mail to Defendant Alvarado and cc'ed Defendants Arroyo, Morrison,

and Casillas.  (Alvarado Decl. Ex. H.)  In that e-mail, Defendant Brown reported that Plaintiff

violated Coleman Center's fiscal policy relating to the retention of four paychecks and that

Plaintiff was caught with a cell phone the previous week. (Id.)  Additionally, Brown reported that

she had been away for the last few days, and is still gathering information on these two offenses.

(Id.)  Lastly, Brown concluded, "[i]t looks like [Plaintiff] is back to his old tricks and we need to

put a handle on him!"  (Id.)  One week later, on July 13, 2005, Defendant Brown followed up her

first e-mail with a second e-mail to the same recipients.  (Alvarado Decl. Ex. I; Pl.'s Resp. CEC

---

[4] In his deposition, Plaintiff provides that he was working for a company who had been
contracted to clean up a Delaware River oil spill in the Philadelphia vicinity, and "was making
like $22 an hour or something of that nature." (Carter Dep. 137:19-138:18.)  Plaintiff recalls
Defendant Alvarado making a statement that "[Plaintiff] was making more money than him." (Id.)

Defs.' Mot. Summ. J., Ex. I.)) The second e-mail addressed the following litany of program violations Plaintiff committed:

> [Plaintiff] states that he cashed his paychecks because he had a rent waiver, he does not have a rent waiver, nor does he have a current home plan submitted. His prior home plan was denied back in March and he has been informed of that several times as well as his agent informing him of such.
> [Plaintiff] was informed in June that he needs to submit a new home plan by July 1, 2005, he provided [Defendant Brown] with an address, phone number and no name. [Defendant Brown] told [Plaintiff] that if [Plaintiff has] an address and a phone number, [Plaintiff has] to have a name!
> [Plaintiff was placed on restriction for not turning in his four paychecks and cashing them as well as for having possession of a cell phone on 7/6.
> [Plaintiff] was made aware of his restriction and went on a social pass on 7/8 ([Defendant Brown] is investigating how [Plaintiff] got out).
> On 7/11 [Plaintiff] signed out for work/treatment from 5:40am to 7:30pm, (A) he returned at 9pm, (B) he never reported to treatment on Monday (New Journey's provided [Defendant Brown] with [Plaintiff's] attendance information).
> Today [Plaintiff] signed out for work/treatment and he is not scheduled for treatment at all today. He signed out from 5:30am to 9pm, since he is not suppose[d] to go to treatment he is suppose[d] to return at 5pm, if he returns at 9 he will be 4 hours late and will have deviated again.
> [Defendant Brown] also contact[ed] New Journey's and found out that [Plaintiff] no longer is suppose[d] to attend three time a week and is only suppose[d] to be there twice a week. They gave him a letter to that effect. So, [Plaintiff] has been signing out for three times a week and not twice a week. He also never provided a copy of his change in schedule for treatment.

(Id.) These infractions led Coleman Center to discharge Plaintiff for a second time and remand him to parole on July 14, 2005. (Alvarado Decl. Ex. J.)

The July 14, 2005 "Termination Letter" cited Plaintiff as having violated "program rule under the title, Major Prohibited Acts, page 20 # G, failure to maintain accountability when outside the facility"; "Major Rules and Procedural Infractions, page 20 # J, deviation or unauthorized absence from work assignment, treatment or the facility, page 21 # Q, failure to comply with fiscal procedures identified by the Pennsylvania Department of Corrections

including weekly payment of rent";[5] "[p]rogram rule, page 18, no cell phones"; "Minor Rules Infractions, page 21 #[#] 2, 6, and 15." (Id.) At that point, Plaintiff was "sanctioned" to the 90-day PennCAPP program, in the Tranquility Unit at the Coleman Center. (Carter Aff. 5; Carter Dep. 89:21-91:02; Alvarado Decl. ¶ 20.) In PennCAPP, residents are under restrictions that forbid them from leaving the Center and are required to participate in counseling programs. (Carter Dep. 89:21-90:21.)

On either July 20 or 21, 2005, Defendant Alvarado served Plaintiff with a "Notice of Charges and Hearing" in relation to Plaintiff's most recent parole violation. (Carter Aff. 5; Alvarado Decl. ¶ 21, Ex. A.) Defendant Alvarado informed Plaintiff that Plaintiff could request a parole violation hearing, in which case Plaintiff would be transferred to SCI-Graterford for the hearing, or that Plaintiff could plead guilty to the parole violation charges and remain in PennCAPP. (Carter Aff. 5.) Defendant Alvarado reminded Plaintiff that – like the last time Plaintiff violated parole – he could spend the maximum amount of time (120 days) waiting for a hearing if he chose to contest the violation. (Id.) Plaintiff pled guilty and served 90 days in the PennCAPP program as a result. (Id.) Plaintiff completed the PennCAPP program on October 12, 2005. (Alvarado Decl. ¶ 22., Ex. F.)

### F. Third Parole Violation: Threat to Defendant Russell

Plaintiff's third parole violation occurred toward the beginning of January 2006. On the afternoon of January 9, 2006, Plaintiff underwent a pat-down by Defendant Russell as Plaintiff sought re-entry to Coleman Center. (Alvarado Decl., Ex. L.) Pursuant to standard operating

---

[5] In his deposition, Plaintiff admitted that Coleman Center residents had to contribute 20% of any income to rent or certain other costs. (Carter Dep. 88:12-88:21.)

procedure, all residents returning to Coleman Center go through a metal detector, and are subject to both wand detection and pat-downs. (Carter Dep. 100:09-101:21.) That afternoon Defendant Russell was the sole CEC staff member responsible for operating this crowded checkpoint; there were roughly thirty residents waiting to go through the security check point. (Carter Dep. 102:10-103:-01.) After Plaintiff passed through the metal detector without the detector alerting, Defendant Russell performed a pat-down of Plaintiff, as Defendant had done with other residents returning that day. In his deposition, Plaintiff averred that Defendant Russell "fondled his crotch" during the pat-down. (Carter Dep. 100:07-101:11.) Plaintiff verbally objected to the search. In his deposition, Plaintiff states that in response to Defendant Russell's search, "I had words with him, and I told him that that's not the manner and method that I was ever searched before, and I said that it was rude and I think you ought to be taught how to search properly." (Id.) Defendant Russell responded that, "I'm only doing my job." (Id.; Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. M; Alvarado Decl. Ex. L.) Plaintiff and Defendant Russell disagree as to what Plaintiff said next. Plaintiff claims that he said, "well, I see I got to write you up, then." (Carter Dep. 100:07-101:11.) Defendant maintains that Plaintiff said, "I see I'm gonna have to fuck you up." (Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. O; Alvarado Decl. Ex. L.)

Around 4.30 p.m.., on January 9, 2006, right after the pat-down, Plaintiff filed a grievance with the Coleman Center describing the incident and requesting that this type of "offensive" search stop. (Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. M.) In the grievance, however, Plaintiff recounts the interaction between himself and Defendant Russell as follows:

> Mr. Russell was doing pat searches in the lobby and he deliberately fondled my cro[t]ch and buttocks while pat searching me. I didn't like it and told him so. Other residents

were present.  Mr. Russell told me was trained to search that way.  I am highly offended and would like his method of searching to stop.  No one else does that.

(Id.)  The next morning, on January 10, 2006 at 7:35 a.m., Defendant Russell filed a "Special Report" – a report of "any incident(s) that has an impact on the orderly operation of the facility" – addressing Plaintiff's actions and statement during the pat-down.  (Id., Ex. O.)  Defendant Russell also filed a "Demerit Report," which cited Plaintiff for threatening him with bodily harm.  (Id., Ex. P.)

On January 11, 2006, Defendant Johnson sent a "Termination Letter" to Defendant Alvarado that informed Alvarado that Plaintiff had been discharged for making a threat to a staff member on January 9, 2006.  (Commonwealth Defs.' Mot. Summ. J., Ex. 1-K.)  The letter noted that Plaintiff "was discharged from Coleman Hall Community Corrections program on January 11, 2006 unsatisfactorily for violating program rule under the title, *II. Major Rules and Procedural Infractions h.[] Making threats of physical violence*."  (Id.)  Following this incident, Plaintiff was remanded to SCI-Graterford.  (Carter Dep. 112:09-112:17.).  Plaintiff completed the remainder of his detention and parole outside of the Coleman Center.  (Id. 114:02-114:21.).

## II.    PROCEDURAL BACKGROUND

Plaintiff filed his initial Complaint in the instant action on September 13, 2006.  Pursuant to section 1983, the Complaint asserted a variety of constitutional rights violations as well as certain state law claims premised on supplemental jurisdiction.  Plaintiff augmented the Complaint through an "Amended Complaint" filed on January 31, 2007.  In accordance with the liberal pleading standard applied to pro se parties, the Court elected to read these two complaints as if they were one.  See Carter v. Morrison, No.CIV.A.06-3000, 2007 WL 4233500, at *1 n.1

(E.D. Pa. Nov. 28, 2007). The Court addressed both CEC and Commonwealth Defendants' Motions to Dismiss, as well as Plaintiff's Responses thereto in its Memorandum and Order issued on November 28, 2007. Id. In its opinion, the Court declined to dismiss the following claims against respective Defendants:

> 1. Plaintiff's First Amendment, Fourteenth Amendment Equal Protection Clause, and 42 U.S.C. 1985(3) Conspiracy to Violate Equal Protection claims – brought pursuant to section 1983 – as to Commonwealth Defendants Alvarado and Casillas.
> 2. Plaintiff's First Amendment, Fourteenth Amendment Equal Protection Clause, and 42 U.S.C. 1985(3) Conspiracy to Violate Equal Protection claims – brought pursuant to section 1983 – as to CEC Defendants Morrison, Arroyo, Lane, Troppauer, King, Russell, and Brown.[6]
> 3. Plaintiff's state law claims (intentional infliction of emotional distress, breach of duty, abuse of authority, abuse of process, false arrest and imprisonment, and conversion) as to CEC itself and CEC Defendants Morrison, Arroyo, Lane, Troppauer, King, Russell, Brown, Johnson, and Rogers.

(See Id.)

On July 14, 2009, Commonwealth Defendants filed a Motion for Summary Judgment. The next day, CEC Defendants also filed a Motion for Summary Judgment. On August 26, 2009, Plaintiff filed his Responses to both CEC and Commonwealth Defendants' Motions. Plaintiff also filed two additional motions on August 26, 2009: (1) a Motion to Dismiss CEC Defendants' Summary Judgment Motion for Failure to File a Statement of Undisputed, or Indisputable Facts, and (2), a Motion to Strike Commonwealth Defendants' Motion for Summary Judgment for Failure of Defendant[s] to Sign the Memorandum of Law. On September 4, 2009, CEC Defendants filed their Response in Opposition of Plaintiff's Motion to Dismiss their Summary Judgment Motion. On September 21, 2009, Commonwealth Defendants filed their

---

[6] While not expressly included in the Court's Order of Nov. 28, 2007, the Court includes CEC Defendant Pamela Brown in its analysis of these claims.

Response in Opposition of Plaintiff's Motion to Strike their Summary Judgment Motion. It is these Summary Judgment Motions, Responses, and procedural objections that the Court now addresses in the present Memorandum.

###    III.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Sovereign Bank v. B.J.'s Wholesale Club, Inc., 533 F.3d 162, 171-72 (3d Cir. 2008) (discussing "well-settled" summary judgment standards). For an issue to be "genuine," there must be sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. Id. The relevant evidence, "whether it is direct or circumstantial[,] must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. KMart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (citation omitted). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). This "materiality determination rests on the substantive law, [for] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id.

In considering a motion for summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences drawn therefrom, in the light

most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  Should a conflict arise between evidence the parties presented, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in [that party's] favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party can meet its burden by "pointing out . . . that there is an absence of evidence to support the non[-]moving party's [claims]."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds by, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999); see also Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009).

Additionally, the Court is mindful that Plaintiff is proceeding pro se.  As it noted in the Memorandum and Order addressing the previous Motions to Dismiss, the Court has "an obligation to read a pro se litigant's pleadings liberally," and the court "must apply the applicable law, regardless of whether the pro se litigant cited the applicable law or referenced it by name." Carter v. Morrison, No. CIV.A. 06-3000, 2007 WL 4233500, at *6 (E.D. Pa. Nov. 28., 2007); see

also <u>Benckini v. Hawk</u>, 654 F. Supp. 2d 310, 316 n.1 (E.D. Pa. 2009). At the summary judgment stage, however, this obliging approach does not relieve non-moving pro se parties of the burden to set forth sufficient evidence for a reasonable jury to return a verdict in their favor. <u>Watson v. Phila. Hous. Auth.</u>, 629 F. Supp 2d 481, 485 (E.D. Pa.. 2009.) ("[D]espite this liberal interpretation [of a 'pro se party's papers'], the same standards for summary judgment apply to pro se litigants. This means that the non[-]moving party 'cannot rely merely upon bare assertions, conclusory allegations or suspicions to support its claim.'") (citations omitted); <u>see also</u> <u>Zilich v. Lucht</u>, 981 F.2d 694, 696 (3d Cir. 1992) (reversing the District Court's decision to dismiss pro se plaintiff's complaint and noting that pro se plaintiff "still has before him the formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [him]'"). Thus, should Plaintiff, or any non-moving party for that matter, fail "to make sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Rule 56(c) requires the entry of summary judgment. <u>Celotex</u>, 477 U.S. at 323.

## IV. DISCUSSION

Plaintiff brings his First Amendment, Fourteenth Amendment Equal Protection, and section 1985(3) conspiracy claims pursuant to 42 U.S.C. § 1983, and invokes supplemental jurisdiction to assert his state law claims.[7] Section 1983 provides a cause of action against any person who acts under the color of state law, and while doing so, abridges the rights created by the Constitution and the laws of the United States. <u>See</u> <u>Gruenke v. Seip</u>, 225 F.3d 290, 298 (3d

---

[7] This Court has jurisdiction to hear this § 1983 on the basis of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), along with supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) to hear the related state law claims.

Cir. 2000) (stating the elements of a section 1983 claim). While section 1983 does not produce any new substantive rights, it serves as a vehicle for federal court review of Constitutional or federal statutory right violations. Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997). Since Defendants do not dispute that they acted "under the color of state law," the Court focuses on whether Defendants' actions violated the Constitution.

### A. Prison Litigation Reform Act

Plaintiff's action falls under the purview of the Prison Litigation Reform Act ("PLRA"). The PLRA, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); Woodford v. Ngo, 548 U.S. 81, 84-85 (2006) (interpreting § 1997e(a)'s exhaustion requirement). Under the terms of § 1997e(a), "all 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" Porter v. Nussle, 534 U.S. 516, 524 (2002) (quoting Booth v. Churner, 532 U.S. 731, 739 (2001). "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." Cosgrove v. Cappachella, 325 Fed. Appx. 52, 54 (3d Cir. 2009) (quoting Porter, 534 U.S. at 524). Moreover, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532. Procedurally, "[f]ailure to exhaust administrative remedies is an affirmative defense for the defendant to plead. Under 1997e(c) failure to exhaust is not a permissible basis for sua sponte

dismissal." Mitchel v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (citing Ray v. Kertes, 285 F.3d 287, 295-296).

In the Motions before the Court, Commonwealth Defendants do not raise the affirmative defense of failure to exhaust all available administrative remedies, and CEC Defendants only raise this defense as to Plaintiff's Equal Protection claim. CEC Defendants argue that Plaintiff's testimony during his deposition that he does not remember whether he filed any complaints regarding alleged disparate treatment as the result of his race demonstrates that he has failed to exhaust administrative remedies regarding this issue. Plaintiff's lack of memory, however, does not relieve CEC Defendants of their burden to demonstrate that Plaintiff failed to exhaust all available administrative remedies. Apart from evidence of Plaintiff's shortcoming of memory and Plaintiff's admission that he did not write his government representatives about the substance of his equal protection allegation, CEC Defendants do not establish in any of their exhibits that Plaintiff failed to file a grievance along the lines of an equal protection violation claim. Thus, CEC Defendants do not meet their burden to demonstrate Plaintiff's failure to exhaust. In turn, the Court finds that section 1997e(a) does not require a grant of summary judgment in this case. See Kirk v. Roan, 160 Fed. Appx. 188, 190-91 (3d Cir. 2005) (Grievance Review Officer's sworn statement that the officer notified prisoner-plaintiff that his grievance appeal was incomplete might have sufficed to demonstrate failure to exhaust administrative remedies but for motion to dismiss standard of review and prisoner's claim and evidence of the alleged mail receipt of his submission.)

**B. First Amendment Retaliation**

Plaintiff alleges that Commonwealth Defendants and CEC Defendants Morrison, Arroyo,

Lane, Troppauer, King, Russell, and Brown all retaliated against Plaintiff for his continual filing of grievances by arresting him for violation of parole on three different occasions, forcing him to restart the Coleman Center program from phase one after his first parole violation, denying his home plans, and interfering with his job search.

To establish a prima facie case for First Amendment retaliation, Plaintiff must show: (1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (further citation omitted). If a prisoner demonstrates that the exercise of a constitutional right "was a substantial or motivating factor" for the adverse action, the prison officials may still prevail by proving by a preponderance of the evidence that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d 330, 334 (3d Cir. 2001) (discussing the implications of the deference owed to prison regulation – as required by Turner v. Safley, 482 U.S. 78, 89 (1987) – on a prisoner's First Amendment retaliation claim). The Court addresses each of the foregoing elements in turn.

### 1. Constitutionally Protected Conduct

In the present case, Plaintiff did engaged in constitutionally protected conduct when he filed multiple request and grievance forms and even wrote to his local government representatives regarding conditions at Coleman Center. As the Third Circuit has determined, a prisoner's filing of a grievance against the prison system is constitutionally protected conduct.

Kelly v. York County Prison, 340 Fed. Appx. 59, 61 (3d Cir. 2009); see also Mitchell, 318 F.3d at 530 (concluding that a grievance filed by a prisoner against a prison official "implicates conduct protected by the First Amendment.").

2. Adverse Action

Moreover, Plaintiff may have experienced sufficiently adverse action at the hands of Commonwealth Defendants and CEC Defendants Morrison, Arroyo, Lane, Troppauer, King, Russell, and Brown. The Third Circuit has emphasized that demonstration of an adverse action taken by prison officials sufficient to deter ordinary individuals from exercising their constitutional right is a fact-intensive inquiry. See Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000) ("Whether a prisoner-plaintiff has met [the adverse action] prong of his or her retaliation claim will depend on the facts of the particular case."). Typically, certain forms of "administrative segregation" that result in a substantial loss of standard privileges and liberty satisfy the adversity element of a retaliation claim. Id. (concluding that "reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in [a] cell for all but five hours per week, denial of access to rehabilitative programs, and significantly, inadequate access to legal research materials and assistance" met the adverse action prong); see also Brooks v. Smith, No. CIV.A. 04-2680, 2007 WL 3275266, at *10-11 (M.D. Pa. Nov. 6, 2007) (noting that placement in a Single Housing Unit (SHU) for three and one-half months and the resulting loss of the "inmate's privileges that he would otherwise enjoy in general population" constituted sufficient adverse action).

Here, certain adverse actions Plaintiff alleges would deter individuals of ordinary firmness from exercising their constitutional rights. At a minimum, Plaintiff's three arrests at

Coleman Center for violating the conditions of his parole and the resulting punitive confinements likely satisfy the adverse action element of his retaliation claim. First, after his September 1, 2004 arrest for violating the conditions of his parole, Plaintiff spent 120 days in a state correctional institution waiting for a full panel hearing on his violation, and thus lost the many privileges available to him at Coleman Center. Second, the July 14, 2005 arrest for violating the conditions of his parole led to a 90-day confinement in Coleman Center's disciplinary program PennCAPP. And third, Plaintiff's January 11, 2006 arrest for violating the conditions of his parole led to Plaintiff's remand to a state correctional institution and the resulting loss of the privileges he held at Coleman Center. Plaintiff also claims and Defendants do not contest the following instances of adverse action: (1) upon Plaintiff's first return to Coleman Center – around January 27, 2005 – after his first violation of parole, Plaintiff was forced to begin the Coleman Center program from the start notwithstanding that he had progressed to a more advanced phase of the program before the remand; and (2), Plaintiff's home plan submitted on February 11, 2005 was wrongly denied.

### 3. Causal Link

Plaintiff, however, has failed to produce sufficient evidence to demonstrate a causal link between the exercise of his constitutional right ( his many grievances, request forms, and entreaties to politicians) and the adverse actions (a series of arrests, interference, and penalties) taken by Commonwealth Defendants and CEC Defendants Morrison, Arroyo, Lane, Troppauer, King, Russell, and Brown. Although, in the context of a retaliation claim, "'suggestive temporal proximity is relevant to establishing a causal link between protected conduct and retaliatory action," evidence of temporal correlation is no substitute for evidence of causation. See

23

Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) (quoting Rauser, 241 F.3d at 334). Evidence that prison officials took adverse action against Plaintiff as the result of legitimate, non-retaliatory factors refutes the existence of a causal link. See Heller v. Keenhold, No. CIV.A.04-1893, 2006 WL 759647, at *7 (M.D. Pa. March 24, 2006) (granting summary judgment against a plaintiff-prisoner's First Amendment retaliation claim where, among other factors, Defendants presented "numerous legitimate, non-retaliatory reasons for Plaintiff's classification"); Redman v. Walton, No. CIV.A.06-1000, 2007 WL 2406939, at * 7 (W.D. Pa. Aug. 21, 2007) (concluding that prisoner-plaintiff failed to state a claim for First Amendment retaliation where the complaint demonstrated that the prison official had a "legitimate, non-retaliatory reason" for confining prison-plaintiff). In the following subsections, the Court addresses each of Plaintiff's claimed instances of retaliation.

    a. CEC and Commonwealth Defendants' Knowledge of Plaintiff's
       Complaints

        The record reveals that both groups of Defendants knew of Plaintiff's many complaints – including formal grievances, request forms, and letter-writing campaign – regarding his treatment and the conditions at Coleman Center. On July 1, 2004, CEC Defendant confronted Plaintiff about his constant complaints and advised him that it would be in Plaintiff's best interests to adjust to life at Coleman Center, as opposed to his constant battle with the Center. Although Plaintiff claims that CEC Defendants Morrison, Brown, and Arroyo threatened retaliation at this meeting for Plaintiff's grievances, the Court finds that these Defendants merely advised Plaintiff that, in their belief, if Plaintiff accepted conditions at Coleman Center and focused his energy on completing the program, Plaintiff would be better off. Plaintiff offers no evidence of either any

threat of retaliation issued, or any relation between this confrontation and the adverse action Plaintiff has alleged. CEC Defendants appropriately expressed their concerns with Plaintiff's behavior to him, and Plaintiff was free to either heed or ignore their advice.

b. First Parole Violation

Plaintiff maintains that the conduct that led to his first violation of parole at the Coleman Center on September 1, 2004 was not prohibited by Coleman Center rules, and thus claims that he was falsely charged as a result of retaliation. The Court finds, however, that the absence of evidence that Plaintiff's grievances served as "a substantial or motivating factor" in his arrest, together with the existence of a legitimate, non-retaliatory rationale for Plaintiff's arrest both refute the allegation of a retaliatory motive. CEC and Commonwealth Defendants evaluated Plaintiff's conduct and determined that Plaintiff wrongly possessed sensitive identification and credit information in violation of Coleman Center rules. (Alvarado Decl., Exs. C, D.) Despite Plaintiff's claim in his Response in Opposition to Commonwealth Defendants' Motion for Summary Judgment that he did not possess the sensitive identification information, the Court finds that Plaintiff failed to create a genuine issue on this point. This conclusion is supported by Plaintiff's admission to Connections Training Staff that he possessed sensitive identification information and his assertion of his Fifth Amendment right during his deposition when asked if he did possess that information. (Alvarado Decl. ¶ 7, Ex. B-C.)[8]

---

[8] Although the Court does not rest solely on this line of argument, it notes that in response to questioning during his deposition about whether he possessed sensitive identification information and his intent in doing so, Plaintiff asserted his Fifth Amendment privilege against compelled self-incrimination. (Carter Dep. 50:05-50:20.) While the assertion of Fifth Amendment right to remain silent generally prohibits any adverse inference, the Supreme Court has concluded that "'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]'" Rad Serv., Inc v.

Plaintiff further claims that the Coleman Center had no right to punish him for conduct that occurred at an outside facility (CTEP) and that Commonwealth Defendants equivocated as to which parole violations to charge Plaintiff.  Contrary to his claims, however, Plaintiff was required to abide by the conditions of his parole whether at Coleman Center or elsewhere.  (CEC Mot. Summ. J. Ex. B, CEC 01-05 "Special Conditions of Parole.")  Additionally, although certain Commonwealth documents include an allegation that Plaintiff violated a provision of a document, "PPBP 336," not produced to the Court, consistent throughout all parole violation documentation is the charge that Plaintiff violated the Coleman Center rule that prohibited possession of sensitive information.  (CEC Mot. Summ. J., Ex. B at CEC 039 (Letter from CEC Defendant King to Commonwealth Defendant Alvarado); (Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. W at 20 (Community Education Center's "Coleman Hall" Resident Handbook.)  Finally, evidence that Plaintiff's parole violation was dismissed for a procedural defect – failure to hold a full panel hearing within 120 days – has no bearing on the merit of the underlying violation.  The absence of evidence regarding any retaliatory intent, in addition to the legitimate rationale for charging Plaintiff with a violation of his parole, leaves no genuine issue as to Plaintiff's retaliation claim for this incident.

### c. Program Phase Grievance

Plaintiff argues that, upon his January 27, 20 05 return to Coleman Center following his first parole violation, CEC Defendants retaliated against him by forcing him to restart Coleman Center's rehabilitation program from phase one despite previously having progressed to phase

---

Aetna Cas. and Sur. Co., 808 F.2d 271, 274 (3d Cir. 1986) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)).

three before his violation of parole. Coleman Center's rehabilitative program is divided into four phases, with each progressive phase entailing greater employment, activity, and living privileges. (Pl.'s Resp. Opp. CEC Mot. Summ. J. Ex. W, 24.) Plaintiff acknowledges in his deposition that Coleman Center program rules direct all new residents to attend the orientation. (Carter Dep. 78:08-85:20.) Furthermore, the Coleman Center Resident Handbook provides that residents upon starting the program "are generally prohibited from outside activities (employment, community service, school, etc.) for a minimum of 30 days unless approved by the Parole Agent." (Pl.'s Resp. Opp CEC Defs.' Mot. Summ. J., Ex. W, 24-25). After 30 days of completing program lectures, seminars, meetings, and other program requirements, as well as after obtaining approval from their parole agent, Coleman residents may begin Phase 2, which entails a work release component. (Id.) CEC and Commonwealth Defendants' decision to require Plaintiff to begin Coleman Center's program from phase one comports with the Handbook's directive and was well within their discretion. Plaintiff has failed to submit any evidence that this decision was retaliatory in nature. While Plaintiff has alleged that other individuals were permitted to re-enter the program and skip orientation, Plaintiff has failed to produce evidence of these occurrences. Thus, Plaintiff has failed to demonstrate a causal link between his re-entry into Coleman Center at phase one and any retaliatory animus for Plaintiff's grievances regarding the Center.

### d. Home Plan Rejection

Plaintiff next claims that Defendants denied his home plan out of retaliation for his filing of grievances. A home plan is a proposal for a suitable living arrangement outside Coleman Center. Although Plaintiff claims that his proposed home plan to move into his uncle's one-

bedroom apartment was denied out of retaliation, the evidence leads the Court to conclude that

CEC and Commonwealth Defendants denied Plaintiff's home plan because it failed to meet the

minimum requirements of an acceptable living arrangement.  Commonwealth Defendant

Alvarado investigated the home plan and discovered that Plaintiff's uncle was about eight

months behind in rent and that the landlord would not allow Plaintiff to live in the apartment due

to Plaintiff's criminal record.  (Alvarado Decl. Ex. G.)  Defendants thus demonstrated that  they

denied Plaintiff's home plan for a legitimate, non-retaliatory reason.  Plaintiff has failed to

submit sufficient evidence to rebut Defendant's apparent motive in denying the home plan.

e.  Second Parole Violation

Plaintiff asserts that Defendants arrested him on July 14, 2005 out of retaliation for the

grievances he filed at Coleman Center.  Plaintiff's multiple infractions are listed in CEC

Defendant Brown's e-mail to Commonwealth Defendants and summarized in a July 14, 2005

Termination Letter.  (Alvarado Decl. Exs. I, J.)  The Court first notes that Plaintiff pled guilty to

these infractions and the resulting parole violation.  His acceptance of responsibility for these

infractions serves as strong evidence that these were legitimate, non-retaliatory charges.

Plaintiff, however, contests the voluntariness of his guilty plea.  He claims that he had little

choice but to plead guilty to a 90-day sentence at Coleman Center's disciplinary program,

PennCAPP, or face the possibility of another 120 days in prison waiting for a full panel parole

hearing.  Although the Court does not find this argument altogether persuasive, it will explore

Plaintiff's retaliation claim in relation to this incident.

Plaintiff first points to the July 1, 2004 meeting with CEC Defendants, where CEC

Defendants advised him that he should  "stop [his] complaining and adjust like the rest" as

evidence of CEC Defendants' retaliatory animus towards Plaintiff. (Carter Aff. 2). As the Court

has concluded, however, evidence of this meeting does not support Plaintiff's claim that CEC

Defendants intended take adverse action against Plaintiff for his filing of grievances. CEC

Defendants merely advised Plaintiff that they believe he would be better served by focusing on

completing the program as opposed to complaining about conditions at the Center. Moreover,

this July 1, 2004 meeting occurred over a year prior to his July 14, 2005 parole violation arrest.

Plaintiff also maintains that CEC Defendant Brown's e-mail to Commonwealth

Defendants, in which she stated that "it looks like [Plaintiff] is back to his old tricks and we need

to put a handle on him," is evidence of a retaliatory motive. Quite to the contrary, the Court finds

the line a reference to Plaintiff's many violations of Coleman Center rules, and the need to

discipline Plaintiff as a result of these infractions. CEC Defendant Brown's two e-mails to

Commonwealth Defendants reveal her clear intent to investigate and fully report Plaintiff's

infraction. Brown first sent an e-mail to Commonwealth Defendants alerting them that she

received report that Plaintiff had committed multiple infractions. Brown's second e-mail goes to

great length to recount all of Plaintiff's many infractions. While Plaintiff maintains his

"innocence" in regard to these infractions, Plaintiff has failed to submit any evidence for the

Court to conclude that these infractions were false, or even trumped up charges; nor has Plaintiff

submitted evidence that would allow the Court to conclude that a retaliatory motive was a

substantial factor in CEC and Commonwealth Defendants actions in arresting Plaintiff for his

second parole violation.

Finally, Plaintiff argues that if these infractions occurred there should have first been first

"issued demerit reports and/or had a hearing[.]" (Pl.'s Resp. Opp. CEC Defs.' Mot. Summ J. 14.)

Plaintiff, however, has submitted evidence that contradicts his claim. The Coleman Center Handbook does not require demerit reports or hearings before the Center refers a resident to the Pennsylvania Department of Correction for violation of program rules. (Pl.'s Resp Opp. CEC Defs.' Mot. Summ. J., Ex. W, 19.) Thus, Defendants' actions in charging and arresting Plaintiff on the basis of these many program rule infractions cannot be said to have been retaliatory.

### f. Third Parole Violation

In relation to Plaintiff's third and final parole violation at Coleman Center, Plaintiff asserts that CEC Defendant Russell retaliated against Plaintiff because Plaintiff filed a grievance against Defendant Russell, which claimed that Defendant Russell performed an overly intrusive frisk. Plaintiff filed his grievance on the same day as the pat-down search, January 9, 2006. The grievance alleges that Defendant Russell "fondled [Plaintiff's] cro[t]ch and buttocks while pat searching [Plaintiff]" and notes that Plaintiff "didn't like [the search] and told [Defendant Russell] so." The grievance makes no other reference to any verbal communication between Plaintiff and Defendant Russell during the incident at issue. The next day at 7.35 a.m., Defendant Russell filed a "Special Report" and a "Demerit Report" citing Plaintiff for threatening Defendant Russell with bodily harm. While Plaintiff claims in his deposition that he told Defendant Russell, "I see I got to write you up, then" Defendant Russell maintains that Plaintiff stated "I see I'm gonna have to fuck you up." Plaintiff nevertheless contends in his Responses to CEC and Commonwealth Defendants' Motions for Summary Judgment that it was his actual grievance that brought Defendant Russell to retaliate against him.

Plaintiff, however, has failed to demonstrate a sufficient causal connection between his filing of a grievance and Defendant Russell's reporting of Plaintiff's alleged threat. Although the

parties dispute what was said between Plaintiff and Defendant Russell, there is no dispute as to

the timing of the respective grievances. These grievances were filed in such close succession,

with Plaintiff filing his in the late afternoon of January 9 and Defendant Russell filing his

grievance in the early morning of January 10, that their timing is not suggestive of a causal link.[9]

Plaintiff has produced no evidence that the grievance counselor ever retrieved Plaintiff's

grievance from the "grievance box," or if he had, that the grievance counselor informed

Defendant Russell of the grievance. Viewing all inferences in the most favorable light to

Plaintiff as the non-moving party, Plaintiff merely has demonstrated a dispute over what was

said. Based on the record before the court, there is a complete absence of evidence regarding

Defendant Russell's potentially retaliatory motive. Certainly, Plaintiff has not produced any

evidence of bad faith on Defendant Russell's part. Defendant Russell, moreover, had only begun

working at Coleman Center on December 19, 2005, and Plaintiff has not produced any evidence

that Defendant Russell was aware of Plaintiff's history of complaints and grievances against

Coleman Center. (Carter Aff. 6.)

    4. Reasonable Relation to a Legitimate Penological Interest

    Even if Plaintiff were able to demonstrate that his filing of grievances was a substantial or

motivating factor in the adverse action discussed in this section, CEC and Commonwealth

Defendants have proven by a preponderance of the evidence that these adverse actions are

_____

[9] The present case is distinct from the facts the Third Circuit addressed in Rauser that led the
Circuit to conclude that "suggestive temporal proximity" was relevant to causation. Rauser, 241
F.3d at 334. Unlike the present case, in Rauser, the prison officials had threatened plaintiff with
adverse action on the basis of plaintiff's exercise of his constitutionally protected right the
evening before they did in fact take adverse action. (Id.) Also setting it apart from the present
case, defendants in Rauser had not demonstrated any legitimate penological interest in the
adverse action they took against plaintiff. (Id.)

reasonably related to a legitimate penological interest. Where "a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison official may still prevail by proving *that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest*." Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002) (quoting Rauser, 241 F.3d at 334) (concluding that even if prison officials were "motivated by animus" to plaintiff-prisoner Carter's jailhouse lawyering, a legitimate penological interest in disciplining prisoner nullified any claim of retaliation). As the Third Circuit noted in Carter, the prisoner-plaintiff's infractions "were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory." Carter, 292 F.3d at 152. The Third Circuit thus concluded that since defendants demonstrated beyond a preponderance of the evidence that plaintiff would have been disciplined regardless of plaintiff's constitutionally protected conduct, defendants must prevail over Plaintiff in regards to Plaintiff's retaliation claim. Id. at 159.

Here, as discussed above, Defendants have submitted appreciable amounts of evidence demonstrating Plaintiff's many program infractions and the resulting failure to adhere to the terms of his parole. For each incident which Plaintiff claimed retaliation, Defendants have demonstrated by a preponderance of the evidence that their disciplinary actions taken against Plaintiff were reasonably related to the legitimate penological interest of enforcing parole conditions along with community corrections regulations. In other words, Plaintiff's violations were sufficiently clear to justify the disciplinary actions Defendants took against him.

In sum, the Court finds no genuine issue of material fact as to any of Plaintiff's First Amendment retaliation claims against CEC and Commonwealth Defendants, and thus grants

both groups of Defendants' Summary Judgment Motions in this regard.

### C. 14th Amendment Equal Protection Claim

Plaintiff further alleges that Commonwealth Defendants and CEC Defendants Morrison, Arroyo, Lane, Troppauer, King, Russell, and Brown arrested him on parole violations and, in general, treated him unfairly as the result of racial animus toward Plaintiff as an African-American. Here too, Plaintiff's claim fails to withstand summary judgment.

The Equal Protection Clause of the Fourteenth Amendment "prohibits states from intentionally discriminating between individuals on the basis of race." Antonelli v. New Jersey, 419 F.3d 267, 274 (3d Cir. 2005). The Supreme Court has repeatedly asserted that "'[p]roof of racially discriminatory intent or purpose is required to' show a violation of the Equal Protection Clause.'" City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003) (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)).

In the present case, Plaintiff has failed to submit sufficient affirmative evidence of any discriminatory intent on behalf of Commonwealth or CEC Defendants. In his Responses, Plaintiff rests his argument on bare assertions that hold no traction on summary judgment. Plaintiff, in his Deposition, avers that CEC Defendant Arroyo and Commonwealth Defendants Alvarado and Casillas acted with racial animus toward Plaintiff since Defendants are Hispanic and Plaintiff is African-American. (Carter Dep. 146:19-149:09.) Evidence of racial differences between prison officials and a prisoner, however, does not support even an inference – let alone the existence – of discriminatory intent. Elsewhere in his deposition, Plaintiff makes the point that when he was being held in Coleman Center's disciplinary unit, PennCAPP, he noted a higher number of African-American residents than Hispanic or Caucasian residents. (Id. 227:23-

228:24.)  Plaintiff, however, has failed to provide any statistics of the general population at Coleman Center that would allow the Court to conclude that the PennCAPP population reveals a discriminatory impact.  And more importantly, evidence of a discriminatory impact must be accompanied by evidence of discriminatory intent.  City of Cuyahoga Falls, 538 U.S. at 194. Plaintiff only provides conclusory allegations as to Defendants' discriminatory intent, thus the Court grants summary judgment in favor of Defendants as to Plaintiff's Equal Protection claim. See White v. Ottinger, 442 F. Supp. 2d 236, 244-45 (E.D. Pa. 2006) (granting defendants' summary judgment motion as to prisoner-plaintiff's section 1983 claim for violation of Equal Protection Clause).

**D.  Section 1985(3) Conspiracy Claim**

Plaintiff further asserts that Defendants engaged in a conspiracy to retaliate against him for his assertion of constitutional rights, to deny him equal protection under the law, to arrest and imprison him, and to prolong his stay at Coleman Center by preventing him from progressing through the program.

Section 1983(5) "permits an action to be brought by one injured by a conspiracy formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'"  Thomas v. Independence Twp., 463 F.3d 285, 298 (3d Cir. 2006) (quoting Farber v. City of Patterson, 440 F.3d 131, 134 (3d Cir. 2006)).  In order to establish a claim brought pursuant to section 1983(5), Plaintiff must demonstrate:

 (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the

conspiracy; (4) whereby a person is injured in his person or property or deprived
of any right or privilege of a citizen of the United States.

Farber, 440 F.3d at 134. "An allegation of conspiracy is insufficient to sustain a cause of action

under 42 U.S.C. § 1985; it is not enough to use the term 'conspiracy' without setting forth

supporting facts that tend to show an unlawful agreement." Gordon v. Lowell, 95 F. Supp. 2d

264, 270 (E.D. Pa. 2000). Moreover, as this Court noted in its Memorandum and Order of

November 28, 2007, "[t]he Supreme Court has stated 'that there must be some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind conspirators' action' to state a

claim under section 1985." Carter v. Morrison, No. CIV.A.06-3000, 2007 WL 4233500, at *15

(E.D. Pa. Nov. 28, 2007) (quoting Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268

(1993)). Lastly, "[c]ivil rights conspiracy claims that are based only on suspicion and

speculation instead of fact do not state a claim." Woods v. Grant, --- F. Supp. 2d. ---, 2009 WL

3423113, at *8 (D. Del. Oct. 23, 2009).

Plaintiff, here, has failed to demonstrate sufficient evidence of Defendants' alleged

conspiratorial motive, and, as the Court previously concluded, any intent on behalf of Defendants

to deny Plaintiff equal protection of the laws. Bray, 506 U.S. at 268 (noting section 1985(3)'s

requirement to establish "discriminatory animus"); Woods, --- F. Supp. 2d. ---, 2009 WL

3423113, at *8 (granting defendants' motion for summary judgment as to plaintiff's section

1985(3) claim for lack of evidence regarding a conspiracy premised on racial animus). Through

their Declarations and Exhibits, Defendants have demonstrated that the adverse action they took

against Plaintiff was premised upon legitimate charges that Plaintiff violated the conditions of his

parole, including Plaintiff's failure to abide by Coleman Center regulations. In his attempt to

rebut these claims, Plaintiff continually relies on bald, unsupported allegations of a conspiracy

Defendants formed to retaliate against Plaintiff on the basis of his race. These unsupported

claims do not satisfy Plaintiff's burden at the summary judgment stage. Since no reasonable jury

could find that Defendants entered into a conspiracy to deprive Plaintiff of equal protection of the

law, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's section

1985(3) claim.

### E. Qualified Immunity

The Court declines to address Defendants' qualified immunity argument in full, since it

finds that Defendants' actions did not violate the constitution. See Pearson v. Callahan, --- U.S. -

---, 129 S.Ct. 808, 818, (2009); Saucier v. Katz, 533 U.S. 194, 201 (2001).

### F. State Law Claims

In regards to the state law claims – conversion and intentional infliction of emotional

distress – he asserts,[10] Plaintiff concedes in his Response "that the CEC Defendants are shielded

by immunity pursuant to the [Pennsylvania] Tort Claims Act." The Court finds that this

concession of immunity voids Plaintiff's conversion and intentional infliction of emotional

distress claims. See McGrath v. Johnson, 67 F. Supp. 2d 499, 511 (E.D. Pa. 1999) ("The

doctrine of sovereign immunity bars damage claims for state law torts against employees of

Commonwealth agencies acting within the scope of their duties, except for several narrow

---

[10] Due to Plaintiff's failure to argue the merits of his breach of duty, abuse of authority, abuse of
process, and false arrest and imprisonment claims, the Court deems Plaintiff to have abandoned
these assorted state law claims. Regan v. Upper Darby Twp., No. CIV.A.06-1686, 2009 WL
650384, at *7 (E.D. Pa. Mar. 11, 2009) (concluding that failure to argue a claim in response to a
summary judgment motion resulted in plaintiff's abandonment of that claim and citing cases
within the Third Circuit for support).

enumerated exceptions.") (citing 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. § 8522); La Frankie v. Miklich, 618 A.2d 985, 986 (Pa. Commw. Ct. 1995) ("[W]hen an employee of a Commonwealth agency was acting within the scope of his or her duties, the Commonwealth employee is protected by sovereign immunity from the imposition of liability for intentional tort claims.").

Even if Plaintiff had first contested and, second, been able to surmount sovereign immunity, both his conversion and intentional infliction of emotional distress claims fall short of withstanding summary judgment. First, the conversion claim itself lacks all merit. "Under Pennsylvania law, the elements to the tort of conversion are: (1) deprivation of another's right of property in, or use or possession of, (2) a chattel, (3) without the owner's consent, and (4) without lawful justification." Sims v. Viacom, No. CIV.A.09-3521, 2009 WL 3856667, at *4, n.5 (E.D. Pa. Nov. 17, 2009) (citing Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 726 (Pa. 1964)).

Plaintiff acknowledges in his deposition that upon his entry to Coleman Center, a counselor went over the rulebook and explained the provision requiring that 20% of a resident's wages were to be turned in for rent. (Carter Dep. 47:04-49:25.) As the Coleman Center Handbook provides, "[w]hen residents have obtained gainful employment they are mandated by the Department of Corrections standards to pay 20% of their net wages towards maintenance fees, 5% towards savings and 10% towards fines, penalties or restitutions. Any resident who fails to pay their maintenance fees or fines will be subject to disciplinary action." (Pl.'s Resp. CEC Defs.' Mot. Summ. J., Ex. W at 10 (Community Education Center's "Coleman Hall" Resident Handbook.)) Had Plaintiff not conceded sovereign immunity, the Court would have

found Coleman Center's policy to constitute sufficient lawful justification to negate Plaintiff's conversion claim.

Second, Plaintiff properly alleged an intentional infliction of emotional distress claim against CEC Defendants, the evidence does not support his claim. The Third Circuit – in the absence of a definitive determination of whether the claim is viable from the Supreme Court of Pennsylvania – has concluded that Pennsylvania law recognizes the tort of intentional infliction of emotional distress, which is established where "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Brown v. Muhlenberg Twp., 269 F.3d 205, 218 (3d Cir. 2001); see also Hoy v. Angelone, 720 A.2d 745, 754 n.10 (Pa. 1998). The requirement of extreme and outrageous conduct sets a high bar: "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Strickland v. Univ. of Scranton, 700 A.2d 979, 987 (Pa. Super. 1997) (citation and internal quotation omitted).

Here, Plaintiff cannot satisfy the requirement of demonstrating extreme and outrageous conduct. While the Court concluded at the Motion to Dismiss stage that it could not dismiss Plaintiff's intentional infliction of emotional distress claim based upon Plaintiff's allegations that CEC Defendants systematically retaliated against him for exercising his First Amendment rights, the Court's determination in this Memorandum that CEC Defendants had legitimate, non-retaliatory reasons to take adverse action against Plaintiff eviscerates his intentional infliction of emotional distress claim. Accordingly, had Plaintiff not conceded CEC Defendant's sovereign

immunity, the Court would have determined Plaintiff's intentional infliction of emotional distress claim to be meritless.

### G.  Plaintiff's Motions to Dismiss Defendants' Summary Judgment Motions for Procedural Defects

Finally, the Court denies both Plaintiff's Motion to Dismiss CEC Defendants' Summary Judgment Motion for Failure to File a Statement of Undisputed, or Indisputable Facts and Motion to Strike Commonwealth Defendants' Motion for Summary Judgment for Failure of Defendant[s] to Sign the Memorandum of Law, because CEC and Commonwealth Defendants adequately followed the Federal Rules of Civil Procedure, the Eastern District of Pennsylvania's Local Rules, as well as this Court's Procedures in submitting their Summary Judgment Motions.

## V. CONCLUSION

For the above-stated reasons, the Court grants CEC and Commonwealth Defendants' Motion for Summary Judgment.

An appropriate order follows.